44 A.3d 396

McKenzie A. NICOLAS

v.

STATE of Maryland.

No. 88, Sept. Term, 2011.

Court of Appeals of Maryland.

May 8, 2012.

386

Brian L. Zavin, Asst. Public defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Ryan R. Dietrich, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

GREENE, J.

On December 12, 2009, three police officers from the Montgomery County Police Department responded to a 911 call in

the Rockville area. Subsequent investigation by the officers led them to question Petitioner, McKenzie A. Nicolas, at his home. As a result of events that occurred during that encounter, Petitioner was charged in the Circuit Court for Montgomery County with one count of disorderly conduct, one count of obstructing and hindering, three counts of resisting arrest, three counts of second degree assault, three counts of second degree assault on a law enforcement officer, one count of malicious destruction of property, and one count of escape.[1] Following a jury trial,[2] the jury convicted Petitioner of one count of resisting arrest and two counts of second degree assault stemming from a confrontation with two of the officers present at the scene. The court imposed a sentence of eighteen months for each of the convictions, to run consecutively with each other, and three years of supervised probation. The court then suspended the sentences for the second degree assault convictions.

After the trial had concluded and the jury had been discharged, an unmarked jury note was found in the record purporting to inquire about whether an assault is committed when contact is made with another person as a result of acting in self-defense. Trial counsel was unaware of the existence of that note during the course of the trial and jury deliberations. The trial judge stated in a letter to Petitioner's appellate counsel that he did not have any recollection of the particular note at issue. Furthermore, the trial judge indicated that his usual practice upon receiving a communication from the jury is to convene with counsel on the record to discuss possible responses and, thereafter, to provide a written response to the jury on the note itself. The trial judge maintained that if he

---

1. The three counts of second degree assault and second degree assault on a law enforcement officer for which Petitioner was charged corresponded to each of the three officers involved in the incident. The three counts of resisting arrest related to three separate incidents that allegedly occurred during the course of the events of December 12, 2009.

2. Petitioner's brother, Dominique Nicolas, was a co-defendant at his trial.

had received the note at issue, he would have handled it in accordance with his usual practice.

Petitioner noted an appeal to the Court of Special Appeals, claiming, *inter alia*, that the trial court erred in failing to merge his second degree assault convictions with his conviction for resisting arrest, thereby vacating his sentences for the second degree assault convictions, and in failing to disclose, to him and his trial counsel, the jury note found in the record. The intermediate appellate court affirmed the judgment of the trial court. We granted *certiorari, Nicolas v. State,* 423 Md. 450, 31 A.3d 919 (2011), to answer the following questions posed by Petitioner:

1. Does a jury note with no date or time stamp found in the appellate record establish that the trial court received the jury communication at issue in order to trigger the requirements of Md. Rule 4–326(d)?

2. Did the Court of Special Appeals err in holding that Petitioner's convictions for second degree assault do not merge into his conviction for resisting arrest for sentencing purposes where the record is ambiguous as to whether the jury convicted Petitioner of second degree assault based on acts different than those underlying his conviction for resisting arrest?

We shall answer the first question in the negative and affirm the judgment of the Court of Special Appeals on that issue. In response to Petitioner's second question, we hold that the intermediate appellate court erred in affirming the trial court's failure to merge Petitioner's convictions for second degree assault into his conviction for resisting arrest, pursuant to the required evidence test. It is ambiguous whether the jury found Petitioner guilty of both counts of second degree assault based on events that were an integral part of the resisting arrest conviction, or whether the underlying factual bases for the second degree assault convictions were separate and distinct from the events leading to Petitioner's conviction for resisting arrest. In such a situation, we resolve the ambiguity in Petitioner's favor. Therefore, we

hold that the trial court should have merged the second degree assault convictions into the conviction for resisting arrest.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Arrest

During Petitioner's trial, the State called Alycia Moss, who testified that on December 12, 2009, at approximately 10:00 p.m., she was at home when she noticed headlights in her driveway. When Ms. Moss went outside, she observed a white SUV backing out of her driveway. According to her, as the SUV backed up, she heard it hit a parked van on her street. Ms. Moss indicated that she called out to the driver of the vehicle, "Hey, you all hit that car." In response, she heard a voice say, "No, I didn't." At that time, Ms. Moss was unaware of the identity of the driver of the vehicle or anyone else who may have been in the vehicle. Ms. Moss testified that she then told the driver that she had his license plate number, and she went inside to write it down. As she was walking inside, Ms. Moss heard a voice in the car say, "I'm going to fucking kill her." She then decided to call 911, and while she was on the phone with the operator, "somebody [came] up to the door and start[ed] banging, and saying stuff." Although Ms. Moss could not hear everything that was being said, she indicated that at some point she heard the word "neighbor" and realized that her neighbor may have been the driver of the SUV. When Ms. Moss expressed that she was on the phone with 911, the person at her door "went away." The police soon arrived at her home, and Ms. Moss recounted the events of the evening to them.

The State next called Officer Jonathan Anspach of the Montgomery County Police Department, who testified that he responded to the 911 call placed by Ms. Moss on December 12, 2009. Officer Anspach testified that Officer Mark Burhoe and Officer William Sands also responded to the scene of the alleged motor vehicle accident. When Officer Anspach arrived at the scene, he and the other officers attempted to identify

the owner of the SUV, which was parked outside with the headlights on and the engine still running. An MVA registration check revealed that Petitioner was the owner of the vehicle. In addition, on the dashboard of the vehicle was a piece of mail addressed to Petitioner. After observing a small dent in the left rear bumper of the SUV, as well as some minor damage to the van that had allegedly been hit, the officers approached Petitioner's house to identify the driver of the vehicle and gather more information about what had happened.

Officer Anspach testified that an older woman answered the door and indicated that her son, Petitioner, had been driving the SUV. The officers entered the home, and according to Officer Anspach, when Petitioner came upstairs from the basement he was "very agitated, started using profanity and everything along those lines." Officer Anspach explained the investigation to Petitioner, who agreed to accompany Officers Anspach and Burhoe outside. Officer Anspach testified that at that point in the encounter, he did not have any intention of placing Petitioner under arrest; the purpose of the interview was to gather information about the alleged accident. According to Officer Anspach's testimony, Petitioner initially walked toward his car when he went outside, but when asked for his identification, Petitioner walked by Officer Anspach "kind of brushing [him] and just pushing [him]" with his arm. The brush or push was hard enough to cause the officer to step back. Officer Anspach indicated that Petitioner then approached the porch, where Officer Burhoe was standing, and "as he walked up to Burhoe, he hit him in the face."

Officer Anspach was asked on direct examination: "[A]fter [Petitioner] had pushed you ... [a]nd hit Officer Burhoe in the face, at that point did you make a decision as to whether or not you wanted to place [Petitioner] under arrest?" Officer Anspach responded, "That decision after he brushed against me, any type of unwanted touching is considered assault on any person, let alone a police officer. So at that point, it was decided he was going to [be] placed under arrest for assault on a police officer." When asked, "[A]fter you and Officer Bu-

rhoe had been assaulted and decided to place [Petitioner] under arrest, did you tell him he was under arrest," Officer Anspach replied that he repeatedly told Petitioner he was under arrest and that Petitioner refused to comply.

Petitioner then attempted to re-enter his home, and Officer Anspach testified that he grabbed onto Petitioner's shirt to keep him outside. Petitioner managed to get back into his house, with Officer Anspach following, and a struggle ensued for several minutes. Officer Anspach stated, "[Petitioner] and I grabbed each other and started pushing each other against the walls and hitting each other." Officer Anspach described in further detail Petitioner's actions during the scuffle:

We were hitting each other in the chest. I don't, [sic] we then hit each other in the face, I don't believe that many times, a few times here and there.

I mean, it was so chaotic for these two or three minutes I don't really remember. It was more or less, the main thing I remember is him grabbing me and me grabbing him and just him putting me in the wall and vi[ce] ver[s]a, for a length of time.

Officer Anspach estimated that "the entire fight was probably two to three minutes." When asked to relate any injuries he sustained "during this fight," Officer Anspach described several abrasions to his knuckles, as well as a lower back strain, which caused him to seek treatment at a local hospital on the night of the incident.

Officer Burhoe testified that he also responded to the hit and run call on December 12, 2009. After observing minor damage on the SUV and on the van that was allegedly hit, Officer Burhoe accompanied Officers Anspach and Sands to Petitioner's home to continue the investigation. Officer Burhoe offered an account of Petitioner's initial demeanor similar to that given by Officer Anspach, describing Petitioner as "agitated" and "shouting curse words." When Petitioner went outside with Officers Burhoe and Anspach, Officer Burhoe asserted that he remained on the porch during that time. Officer Burhoe testified that Petitioner initially walked toward

his car but then turned around and "pushed Officer Anspach as he was coming up the steps and at that point, you know, I had said, you know, listen. We're just trying to talk at which time he says, oh hell no. And I put my arm in front of him so he wouldn't walk past me." Officer Burhoe stated that when he put his arm up in front of Petitioner to stop him from going back inside, "[Petitioner] swung and knocked my arm out of the way and punched me in the face at the same time" with the back of his closed fist. The prosecutor asked Officer Burhoe on direct examination: "After [Petitioner] pushed Officer Anspach, did you make a decision whether or not at that point [Petitioner] had committed a crime . . . [a]nd . . . whether or not you wanted to place him under arrest?" Officer Burhoe responded that because Petitioner "had committed assault on a police officer," he was going to place Petitioner under arrest.

According to Officer Burhoe, Petitioner then attempted to go back inside his house, and Officer Burhoe grabbed the back of his sweater and told him he was under arrest. Despite the officers' efforts, Petitioner was able to get back inside, and the officers followed him in an attempt to effectuate the arrest. A struggle ensued in the kitchen, and Petitioner continued to resist being placed under arrest. Officer Burhoe testified that he observed Petitioner punching Officer Anspach and pushing him against walls and doors. While Officer Burhoe was attempting to assist Officer Anspach, Petitioner's brother pulled Officer Burhoe from behind and punched him in the face several times. At trial, the State entered into evidence a picture of Officer Burhoe's face that depicted the injuries he suffered as a result of being hit by Petitioner and his brother. Officer Burhoe also described a back injury he sustained while attempting to put Petitioner in a police car after placing handcuffs on him:

Ms. Kaplan: [D]id you have to go hands on with him again?

Officer Burhoe: Yes, we did.

Ms. Kaplan: Okay. And when you did that, this is outside now?

Officer Burhoe: Yes, it is.

Ms. Kaplan: And you were explaining you were attempting to get him to the ground?

Officer Burhoe: We were attempting to get him to the ground. At first, we put him up against the hood of the cruiser which, because sometimes if we're able to bend them across the hood of the cruiser, we can kind of end the situation because a lot of people realize, okay, well, this is done.

But that didn't happen with him. He was [s]till fighting the whole way, so we pulled him off of the cruiser and we struggled with him, actually back past the broken mirror to another part of the street, at which point I hooked my right arm into his right shoulder and twisted him, flipped him over my back onto the ground and I actually ended up landing on him because of the momentum. And the twist and falling back on my back on top of him is what injured my back.

Ms. Kaplan: Your back. And that was based on the force of [Petitioner] pulling you to the ground?

Officer Burhoe: It was based on me trying to get him to the ground.

Ms. Kaplan: Okay. Had he not been resisting the arrest, would you have had to do that?

Officer Burhoe: Oh, absolutely not.

As a result of his injuries, Officer Burhoe took himself to the emergency room on the night of the incident.

Officer Sands also testified about the events that occurred on December 12, 2009. He indicated that when Officers Anspach and Burhoe went outside with Petitioner, he (Officer Sands) remained inside to speak with Petitioner's parents. At some point not long after the officers went outside with Petitioner, Officer Sands was hit from behind with the front door. He turned around and observed both officers "fighting" with Petitioner. Officer Sands testified that he heard Officers Anspach and Burhoe telling Petitioner he was under arrest and commanding that he put his hands behind his back.

Officer Sands stated that when the "scuffle" moved into the kitchen, Petitioner was hitting, pushing, shoving, and slapping Officer Anspach.

Petitioner later testified on his own behalf, offering a vastly different version of events. According to Petitioner, when the officers came to his home to question him about the alleged hit and run, they began "pulling" him and "tasing" him without any provocation. When asked whether he was swinging at the officers, Petitioner stated that he did not swing at them and, in fact, he had his hands up. According to Petitioner, when he initially followed Officers Anspach and Burhoe outside, he did not touch either one of them; rather, he walked around the officer who was "in the doorway" to regain entry into his home. When asked whether he pushed the officer out of the way to get past him, Petitioner stated, "No, sir. I would never touch an officer. I know what's assault to even touch, or whatever." Petitioner claimed that the officers abused him throughout the entire encounter, "throwing [him] down the stairs" after they had handcuffs on him and "hitting [him] in the back of the head." Petitioner asserted that he was not at any time resisting arrest or attempting to struggle with the officers.

The verdict sheet [3] indicated that the following charges were before the jury for consideration: resisting arrest, when initially placed under arrest for assaulting a police officer (count 1); disorderly conduct (count 2); second degree assault of Officer Anspach (count 3); second degree assault of Officer Burhoe (count 4); second degree assault of Officer Sands (count 5); second degree assault of a law enforcement officer, Officer Anspach (count 6); second degree assault of a law enforcement officer, Officer Burhoe (count 7); second degree assault of a law enforcement officer, Officer Sands (count 8); malicious destruction of property (count 9); resisting arrest by grabbing the taser of Officer Sands (count 10); and resisting

---

**3.** The charging document also charged Petitioner with escape and obstructing and hindering a law enforcement officer. Those charges were not presented to the jury.

or interfering with arrest by resisting the officers outside as they attempted to walk to, and get Petitioner into, the police cruiser (count 11). Of particular relevance to this discussion, the jury was given the following instruction regarding the offense of assault:

> An assault is the generic term which includes battery. Assault is causing offensive physical contact to another person. In order to convict the defendant[ ] of assault, the State must prove, one, that the defendant caused offensive physical contact with or physical harm to the victim or victims, that the contact was the result of an intentional or reckless act of the defendant and was not accidental, and that the contact was not consented to by the victims and/or was not legally justified.

The jury was also instructed about the offense of resisting arrest:

> In order to convict the defendant of resisting arrest, the State must prove, one, that a law enforcement officer attempted to arrest the defendant, two, that the defendant knew that a law enforcement officer was attempting to arrest him, three, that the officer had reasonable grounds to believe that the defendant was committing or had committed a crime, and four, that the defendant refused to submit to the arrest and resisted the arrest by force.

The jury returned the following guilty verdicts against Petitioner: resisting arrest, when initially placed under arrest for assaulting a police officer (count 1); second degree assault of Officer Anspach (count 3); and second degree assault of Officer Burhoe (count 4). The jury found Petitioner not guilty of the remaining charges. The trial judge sentenced Petitioner to eighteen months for the resisting arrest conviction, with credit for time served; eighteen months for second degree assault of Officer Anspach, to run consecutively with the sentence for count one, which was suspended; eighteen months for second degree assault of Officer Burhoe, to run consecutively with the sentences for counts one and three,

which was suspended; and three years of supervised probation.

Petitioner noted an appeal to the Court of Special Appeals, contending, *inter alia*, that the trial court erred in failing to merge the convictions for second degree assault with the conviction for resisting arrest, thereby asserting that the sentences for the assault convictions should be vacated. In an unreported opinion, the intermediate appellate court affirmed the convictions and sentences of the trial court. The court relied upon the cases of *Grant v. State,* 141 Md.App. 517, 786 A.2d 34 (2001) and *Cooper v. State,* 128 Md.App. 257, 737 A.2d 613 (1999), to support its conclusion that if an assault is committed in the course of resisting an arrest, "[a] merger of conviction is . . . compelled in order to avoid multiple punishment." The court then analyzed the "issue of sequence" to determine whether the assaults for which Petitioner was convicted occurred prior to any attempt to arrest him or whether they occurred during the course of Petitioner's resistance of his arrest. The court concluded that, because the assault on Officer Anspach was the basis for the arrest, it must have preceded it; thus, that conviction would not merge into the conviction for resisting arrest. In its review, the intermediate appellate court decided to "accept that version of the evidence, including the inferences that may fairly be drawn therefrom, most favorable to the State." While the court acknowledged that the factual basis for the assault on Officer Burhoe was somewhat ambiguous, it concluded that there was legally sufficient evidence to support the inference that the assault on Officer Burhoe occurred prior to any communication to Petitioner that he was being placed under arrest. According to the intermediate appellate court, because the assault on Officer Burhoe was separate and distinct from the resisting arrest, that assault conviction also need not merge into the resisting arrest conviction.

### The Jury Note

At some point after the jury returned with its verdict and had been excused, four notes, all written on loose-leaf style,

lined paper, were found in a single envelope contained within the court file marked "Jury Notes, Filed." Three of the notes contain questions directed to the court, and, at the bottom of the respective notes, there are handwritten answers to the questions, accompanied by the trial judge's apparent signature and an indication of the date and time. The first note contains the following question: "May we see the charging documents?" The handwritten response is: "No[.]" The response is signed by the trial judge and indicates a date and time of "3/11/10 12:15 PM[.]" The second note reads: "[P]lease define the word *offensive* as applied in the directions for second degree ass[a]ult. 'Assault is causing *offensive* physical contact to another person.'" The response on the note reads: "Please refer to the jury instructions." Below the response is the trial judge's signature and the following date and time: "3/11/10 1:25 PM[.]" The third note contains the following inquiry: "There is no instruction on interference with the arrest of another. If we don[']t have an instruction for interfering w/ arrest, can we reach a finding? (The only instruction is for resisting your own arrest)[.]" Within the envelope, there is a photo copy of the third note that contains a handwritten response at the bottom. The response reads: "Yes—You have been instructed on resisting [and] you can use that instruction along w/ your own understanding of interference." Below the signature of the trial judge is the following date and time: "3/12/10 10:40 AM[.]" The Fourth note, the note at issue in this case, contains the following question: "Does assault cover physical contact when done in self-defense?" The Note contains no other markings. In addition, while the transcript reflects a discussion on the record between counsel and the trial judge regarding responses to the first three notes, the transcript does not contain any mention of the Fourth note or its contents.

In an attempt to discover the origins of the Fourth note, Petitioner's appellate counsel sent a letter to the trial judge, the Assistant State's Attorney who prosecuted the case, and Petitioner's trial counsel, inquiring about the Note. In response, both attorneys and the trial judge indicated that they had no independent recollection of the Note at issue. Fur-

thermore, the trial judge indicated that his usual practice when receiving a communication from the jury is to provide counsel with a copy of the note, to convene with counsel on the record to discuss possible responses, and to supply an answer to the jury on the note itself. The trial judge stated that his usual practice, as reflected on the first three notes, includes providing a signature, as well as the date and time, to accompany the written response. The judge maintained that had he received the Note at issue, he would have followed his usual practice.

In his appeal to the Court of Special Appeals, Petitioner contended that the trial court erred in failing to disclose the Fourth note to him and his trial counsel, thus violating the mandates of Maryland Rule 4–326(d). The intermediate appellate court began its analysis with the premise that the requirements of Rule 4–326(d) are not triggered until the court receives a communication from the jury. As the Court of Special Appeals phrased the issue: "The only question before us is whether, as a matter of fact, the activating threshold of a receipt by Judge Algeo of a communication from the jury was ever crossed." The court contrasted the handling of the first three notes with that of the Fourth note, explaining that the Fourth note was never mentioned in the trial transcript, it was never marked as an exhibit, it was never responded to by the court, and it contained no date or time-stamp. Distinguishing the facts regarding the Note in this case with the facts surrounding discovery of the notes at issue in *Denicolis v. State*, 378 Md. 646, 837 A.2d 944 (2003) and *Fields v. State*, 172 Md.App. 496, 916 A.2d 357 (2007), the intermediate appellate court concluded that Petitioner had not established a prima facie case that the trial court ever received the Fourth note; thus, according to the Court of Special Appeals, Rule 4–326(d) was never triggered.

## DISCUSSION

### Merger of Convictions

Our resolution of the issue of merger, as it relates to Petitioner's convictions for second degree assault of Officer

Anspach, second degree assault of Officer Burhoe, and resisting arrest, involves essentially two issues: (1) whether the offenses merge under the required evidence test and (2) whether a reasonable jury would have concluded that the offenses were based on the same acts or on acts that were separate and distinct. As discussed in greater detail, we hold that the offenses of resisting arrest and second degree assault merge under the required evidence test. Furthermore, we hold that where there is a factual ambiguity in the record, in the context of merger, that ambiguity is resolved in favor of the defendant. Here, a reasonable jury could have concluded either that the factual bases underlying Petitioner's convictions for second degree assault were separate and distinct from the facts surrounding his conviction for resisting arrest, or that the assaults were an integral part of the resisting arrest. In light of this factual ambiguity, we resolve the issue in Petitioner's favor by determining that the assault convictions and the resisting arrest conviction were based on the same act or acts committed by Petitioner. Thus, the trial judge should have merged the second degree assault convictions with the conviction for resisting arrest.

This Court has consistently explained and applied the principle of merger in the following way:

> The Fifth Amendment to the United States Constitution, which is applicable to the States, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." *Benton v. Maryland,* 395 U.S. 784 [793], 89 S.Ct. 2056 [2062], 23 L.Ed.2d 707 [715] (1969); *State v. Boozer,* 304 Md. 98, 101, 497 A.2d 1129, 1130 (1985). The Double Jeopardy Clause forbids multiple convictions and sentences for the same offense. *Holbrook [v. State],* 364 Md. [354] 369, 772 A.2d [1240] 1248 [ (2001) ]; *Nightingale v. State,* 312 Md. 699, 702, 542 A.2d 373, 374 (1988); *Brown v. State,* 311 Md. 426, 431, 535 A.2d 485, 487 (1988); *Boozer,* 304 Md. at 101, 497 A.2d at 1130. Under the common-law rule of merger as well, when offenses merge, "separate sentences are normally precluded." *State v. Lancaster,* 332 Md. 385, 392, 631 A.2d 453, 457 (1993); *see White*

*v. State,* 318 Md. 740, 743, 569 A.2d 1271, 1273 (1990). Offenses merge and separate sentences are prohibited when, for instance, a defendant is convicted of two offenses based on the same act or acts and one offense is a lesser-included offense of the other. *Lancaster,* 332 Md. at 391, 631 A.2d at 456.

"Under 'both federal double jeopardy principles and Maryland merger law, the test for determining the identity of offenses is the required evidence test.' " *Nightingale,* 312 Md. at 703, 542 A.2d at 374; *see, e.g., Holbrook,* 364 Md. at 369–70, 772 A.2d at 1249 ("[U]nder Maryland common law, the required evidence test is the appropriate test for determining whether the different statutory or common law offenses, growing out of the same transaction, are to merge and be treated as the same offense for double jeopardy purposes."); *Dixon v. State,* 364 Md. 209, 236, 772 A.2d 283, 299 (2001); *Lancaster,* 332 Md. at 391, 393 n. 8, 631 A.2d at 456, 457 n. 8 ("In addition to being the normal standard for determining merger of offenses under Maryland common law, the required evidence test is also the usual test for determining when two separate offenses ... shall be deemed the same for purposes of the prohibition against double jeopardy." [ (citations omitted) ] ); *Monoker v. State,* 321 Md. 214, 219, 582 A.2d 525, 527 (1990); *White,* 318 Md. at 743, 569 A.2d at 1272.

Writing for this Court in *Lancaster,* Judge Eldridge provided a thorough explanation of the required evidence test:

> The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter. *Snowden v. State, supra,* 321 Md. [612] 617, 583 A.2d [1056] 1059 [ (1991) ], quoting *State v. Jenkins,* 307 Md. 501, 517, 515 A.2d 465, 473 (1986). Stated another way, the required evidence is that which is minimally necessary to secure a conviction for each ... offense. If each

offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, there is no merger under the required evidence test even though both offenses are based upon the same act or acts. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, and where both offenses are based on the same act or acts ... merger follows. *Williams v. State, supra*, 323 Md. [312] 317–318, 593 A.2d [671] 673 [ (1991) ], quoting in part *Thomas v. State*, 277 Md. 257, 267, 353 A.2d 240, 246–47 (1976).

332 Md. at 391–92, 631 A.2d at 456–57 (internal quotation[ ] marks omitted). The required evidence test is the "threshold" test and, if it is met, merger follows as a matter of course. *Id.* at 394, 631 A.2d at 458. (Footnote omitted.)

*Khalifa v. State*, 382 Md. 400, 431–433, 855 A.2d 1175, 1193–94 (2004).

■ As we stated in *McGrath v. State*, 356 Md. 20, 736 A.2d 1067 (1999), "[w]hen there is a merger under the required evidence test, separate sentences are normally precluded." *McGrath*, 356 Md. at 24, 736 A.2d at 1069 (quoting *Lancaster*, 332 Md. at 392, 631 A.2d at 457). Rather, the lesser included offense merges into the greater offense, and a sentence is imposed only for the offense having an additional element or elements. *Id.; Miles v. State*, 349 Md. 215, 220, 707 A.2d 841, 844 (1998). A sentence will be imposed in accordance with this principle regardless of the penalties carried by the respective offenses. *See Dixon v. State*, 364 Md. 209, 238, 772 A.2d 283, 300 (2001) (noting that " 'where there is a merger of a lesser included offense into a greater offense, we are not concerned with penalties—the lesser included offense generally merges into and is *subsumed* by the greater offense regardless of penalties' " (quoting *Spitzinger v. State*, 340 Md. 114, 125, 665 A.2d 685, 690 (1995))).

The two offenses at issue in this case are second degree assault and resisting arrest, both of which have been codified

by the Maryland General Assembly. Assault is defined in Md.Code (2002, 2011 Cum.Supp.), § 3–201(b) of the Criminal Law Article as "the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." [4] Section 3–203 of the Criminal Law Article prohibits the offense of second degree assault and provides a penalty upon violation of imprisonment not exceeding ten years or a fine not exceeding $2,500 or both. Md.Code (2002, 2011 Cum.Supp.), § 3–203 of the Criminal Law Article.

As indicated by the statutory language, the offense of second degree assault retains its common law meaning. We stated in *Abeokuto v. State,* 391 Md. 289, 893 A.2d 1018 (2006), that "[w]hen applying the required evidence test to multi-purpose offenses, *i.e.,* offenses having alternative elements, a court must examine the alternative elements relevant to the case at issue." *Abeokuto,* 391 Md. at 353, 893 A.2d at 1055 (quoting *McGrath,* 356 Md. at 24, 736 A.2d at 1069). Because the assaults for which Petitioner was convicted were clearly of the battery variety, we will focus our analysis under the required evidence test on the elements of that form of the offense of second degree assault. Under Maryland common law, an assault of the battery variety is committed by causing offensive physical contact with another person. In the present case, the trial judge, in accordance with the Maryland Criminal Pattern Jury Instructions (MPJI–Cr), instructed the jury in this case that to find Petitioner guilty of assault, the State must prove that: (1) the defendant caused offensive physical contact with, or harm to, the victim; (2) the contact was the result of an intentional or reckless act of the defendant and

---

**4.** In *Robinson v. State,* 353 Md. 683, 728 A.2d 698 (1999), we addressed the issue of whether the assault statutes, adopted in 1996, repealed the common law offenses of assault and battery. In that case, we stated, "By subsuming and combining all statutory offenses of assault then existent as well as all common law forms of assault and battery into a single and comprehensive statutory scheme, the 1996 assault statutes represent the entire subject matter of assault crimes." *Robinson,* 353 Md. at 695–96, 728 A.2d at 703–04. Thus, we held that the assault statutes abrogated the common law offenses of assault and battery. *Robinson,* 353 Md. at 696, 728 A.2d at 704.

was not accidental; and (3) the contact was not consented to by the victim or was not legally justified. *See* MPJI–Cr 4:01 (2007 Supp.); *Epps v. State,* 333 Md. 121, 127, 634 A.2d 20, 23 (1993); *Snowden,* 321 Md. at 617, 583 A.2d at 1059.

The statutory offense of resisting arrest is codified at Md.Code (2004, 2011 Cum.Supp.), § 9–408 of the Criminal Law Article. Subsection (b) provides that "[a] person may not intentionally ... resist a lawful arrest[.]" Prior to its codification, the crime of resisting arrest was a common law offense. *See Purnell v. State,* 375 Md. 678, 687, 827 A.2d 68, 73 (2003). Here, the trial judge instructed the jury that in order to find Petitioner guilty of resisting arrest, the State must prove that: (1) a law enforcement officer attempted to arrest the defendant; (2) the defendant knew that a law enforcement officer was attempting to arrest him; (3) the officer had reasonable grounds to believe that the defendant was committing or had committed a crime; and (4) the defendant refused to submit to the arrest and resisted the arrest by force. *See* MPJI–Cr 4:27.1 (2007 Supp.); *Barnhard v. State,* 325 Md. 602, 609–10, 602 A.2d 701, 705 (1992) (explaining that to convict a defendant of resisting arrest, the State must prove that: (1) the defendant was arrested; (2) the arrest was lawful; and (3) the defendant resisted or refused to submit to that arrest).

While this Court has not yet addressed the particular merger issue posed by Petitioner, the Court of Special Appeals has discussed whether the offenses of second degree assault and resisting arrest merge under the required evidence test. In *Cooper v. State,* 128 Md.App. 257, 261, 737 A.2d 613, 615 (1999), Cooper was convicted, *inter alia,* of one count of resisting arrest and two counts of second degree assault. The trial judge sentenced Cooper to five years for the resisting arrest conviction and ten years for each assault conviction. *Id.* On appeal to the Court of Special Appeals, Cooper claimed that the convictions for assault should be merged into the conviction for resisting arrest. *Id.* The facts underlying the convictions are relatively simple. After an informant for the Washington County Narcotics Task Force engaged in a drug transaction with Cooper, Officer Kayser, a

member of the arrest team, attempted to arrest Cooper. *Cooper*, 128 Md.App. at 262–63, 737 A.2d at 615–16. During that attempt, Cooper pulled away and punched Officer Kayser repeatedly in the head. *Cooper*, 128 Md.App. at 263, 737 A.2d at 615–16. Sergeant Haltzman then attempted to effectuate the arrest, and Cooper struck him in the face. *Cooper*, 128 Md.App. at 263, 737 A.2d at 616.

The intermediate appellate court examined the elements of resisting arrest by reviewing the Maryland Criminal Pattern Jury Instructions for resisting a warrantless arrest. *Cooper*, 128 Md.App. at 265, 737 A.2d at 617. The court also discussed the applicable elements for an assault that is based upon "the unlawful application of force to the person of another." *Id.* The court ultimately concluded that "because all of the elements of assault are included in resisting arrest, the two offenses satisfy the required evidence test." *Cooper*, 128 Md.App. at 266, 737 A.2d at 617. Furthermore, when considering whether the convictions for the assaults and the resisting arrest stemmed from the same act or acts committed by Cooper, the court concluded that "the only force applied to Officers Haltzman and Kayser was that utilized by [Cooper] to resist arrest." *Id.* Thus, the court determined that Cooper's convictions for second degree assault should merge into his conviction for resisting arrest. *Id.*

In *Grant v. State*, 141 Md.App. 517, 786 A.2d 34 (2001), the Court of Special Appeals affirmed its holding in *Cooper* with regard to merging convictions for second degree assault and resisting arrest. In *Grant*, the trial court denied Grant's request to merge his two assault convictions into his conviction for resisting arrest. *Grant*, 141 Md.App. at 521, 786 A.2d at 36. Evidence was produced by the State at trial that in response to a 911 call, three officers from the Salisbury City Police Department entered Grant's apartment. *Grant*, 141 Md.App. at 522, 786 A.2d at 36–37. Officer Drewer testified that after he observed drug paraphernalia in one of the rooms, Grant "became hostile and started fighting" with Officer Taylor. *Grant*, 141 Md.App. at 524, 786 A.2d at 38. Officer Drewer informed Grant that he was under arrest and instruct-

ed him to place his hands behind his back. *Grant*, 141 Md.App. at 525, 786 A.2d at 38. Grant continued to struggle, and Officer Drewer was struck by Grant's arms and legs. *Id.* The jury found Grant guilty of assaulting Officers Drewer and Taylor, as well as resisting arrest. *Grant*, 141 Md.App. at 527, 786 A.2d at 39. On review, the intermediate appellate court held that, although second degree assault merges into resisting arrest under the required evidence test, "[Grant's] assault on Officer Taylor, unlike his assault on Officer Drewer, occurred before any attempt was made to arrest him." *Grant*, 141 Md.App. at 541, 786 A.2d at 48. Thus, the court determined that the trial court should have merged Grant's conviction for second degree assault of Officer Drewer into his conviction for resisting arrest, but that the conviction for second degree assault of Officer Taylor did not stem from the same act or acts leading to Grant's conviction for resisting arrest. *Grant*, 141 Md.App. at 542, 786 A.2d at 48.

Petitioner relies on *Cooper* and *Grant* for his assertion that, "where it is based on the same underlying conduct, second degree assault merges into resisting arrest under the required evidence test." Contrary to Petitioner's position, the State contends that second degree assault does not merge into resisting arrest because "despite some facial similarity, each of those offenses requires a different element from the other." According to the State, "unlike with a second-degree assault, there is simply no requirement that the force used to resist an arrest be employed against the *person* of the officer." The State provides several examples of force that would be sufficient to constitute resisting arrest but that would not be sufficient to constitute second degree assault against a police officer.[5] Maintaining that a defendant must "cause" the offen-

---

5. For example, "if a defendant, standing in a doorway, is told by an officer that he is under arrest, but, before the officer can physically place him under arrest, the defendant shuts the door and applies force to the door to prevent the officer from opening that door, such a defendant would have used force to resist an arrest (and thus be guilty of resisting arrest) despite having used no force against the person of the officer."

sive touching required to be found guilty of second degree assault, the State asserts that second degree assault contains an element that is not required to satisfy the offense of resisting arrest. Additionally, the State claims that "[b]ecause the offenses of resisting arrest and second-degree assault are premised on different victims and different harms, merger of those offenses is not appropriate." The State cites *Purnell v. State,* 375 Md. 678, 827 A.2d 68 (2003), in support of its position that the offenses are distinct because second degree assault is an offense against a person and resisting arrest is an offense against the State.

We agree, however, with Petitioner's position and with the analysis provided by the Court of Special Appeals in *Cooper* and *Grant,* and we hold that the offense of second degree assault merges into the offense of resisting arrest under the required evidence test. As we have stated, " 'if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter.' " *Lancaster,* 332 Md. at 391, 631 A.2d at 456 (quoting *Snowden,* 321 Md. at 617, 583 A.2d at 1059). All of the elements of second degree assault are included within the offense of resisting arrest. The "force" that is required to find a defendant guilty of resisting arrest is the same as the "offensive physical contact" that is required to find a defendant guilty of the battery variety of second degree assault. Furthermore, there is no element required to satisfy the offense of second degree assault that is different from or additional to the elements required to satisfy the offense of resisting arrest. The State makes the argument that force applied by a defendant to resist arrest does not have to take the form of force against a person, *i.e.,* a law enforcement officer; thus, the offenses need not merge. While we agree with the State's contention that the force element of resisting arrest need not always constitute second degree assault against a law enforcement officer, we hold that when the force used by a defendant to resist arrest *is* the same as the offensive physical contact with a law enforcement officer at-

tempting to effectuate that arrest, the convictions merge under the required evidence test.

■ Merger occurs as a matter of course when two offenses are deemed to be the same under the required evidence test *and* "when [the] offenses are based on the same act or acts[.]" *Holbrook v. State*, 364 Md. 354, 370, 772 A.2d 1240, 1249 (2001). Having concluded that the offenses of second degree assault and resisting arrest merge under the required evidence test, we next consider whether those offenses were based on the same act or acts committed by Petitioner in the instant case. We further hold that, in light of the factual ambiguities produced at trial, which we resolve in Petitioner's favor,[6] Petitioner's convictions for assault and resisting arrest were based on the same act or acts. Thus, the trial court should have merged the assault convictions into the conviction for resisting arrest.

In the case of *Nightingale v. State*, 312 Md. 699, 542 A.2d 373 (1988), we discussed similar merger issues related to two petitioners, Nightingale and Myers. In reviewing both cases, we addressed whether the petitioners' convictions for child abuse and certain sexual offenses would merge under the required evidence test. *Nightingale*, 312 Md. at 700, 542 A.2d at 373. After discussing the particular facts of each case and the elements of each offense, we determined, "Under these circumstances, we believe that each jury could have found the

----

6. The Court of Special Appeals analyzed the merger issue presented by Petitioner as a question of legal sufficiency and, thus, it decided to review the evidence, and the reasonable inferences drawn therefrom, in the light most favorable to the State. As Maryland case law indicates, the appropriate standard to apply when addressing a question of factual ambiguity in the context of merging convictions is to resolve the ambiguity in the defendant's favor in a situation where it is impossible to know for certain the rationale of the trier of fact for finding the convictions entered against the defendant. *See Snowden*, 321 Md. at 619, 583 A.2d at 1059-60; *Nightingale*, 312 Md. at 708, 542 A.2d at 377; *State v. Frye*, 283 Md. 709, 723-25, 393 A.2d 1372, 1379-80 (1978); *Cortez v. State*, 104 Md.App. 358, 361, 656 A.2d 360, 361 (1995). Thus, we apply that standard, and not the standard employed by the intermediate appellate court, in our analysis of the relevant issues.

defendant before it guilty of child abuse based solely on evidence of a sexual offense in some degree. If that were done, then the sexual offense became, in effect, a lesser included offense of sexual child abuse, and ... the offenses are the same for double jeopardy purposes." *Nightingale*, 312 Md. at 708, 542 A.2d at 377. We concluded, however, that we could not decipher from the trial records whether the factual bases underlying the convictions of both petitioners were based on the same acts or on different acts committed by the petitioners. *Id.* We held that the proper approach in such a situation was to resolve the ambiguity in favor of the petitioners and to merge the convictions for the sexual offense counts. *Id.* (citing *State v. Frye*, 283 Md. 709, 723–25, 393 A.2d 1372, 1379–80 (1978)).

In *Snowden v. State*, 321 Md. 612, 614, 583 A.2d 1056, 1057 (1991), this Court addressed the issue of whether Snowden's conviction for assault and battery merged into his conviction for robbery with a dangerous and deadly weapon. We recounted the following relevant facts:

> Upon hearing noises in the kitchen, the restaurant manager, Framouzis Stamidis, came from the office to the kitchen where he was immediately shot in the left arm by Snowden. [The victims] were then told to lie down on the floor. Snowden, while pointing his rifle at the two [victims], asked repeatedly where Stamidis' gun was, but after several denials by Stamidis of the existence of a gun in the restaurant, Snowden ordered Stamidis to take him to the money. Still at gunpoint, Stamidis led Snowden to the office where the money was located, and Snowden and his accomplice left with $3000 taken from the restaurant.

*Snowden*, 321 Md. at 615, 583 A.2d at 1057–58. Snowden claimed that the conviction for assault and battery should merge into the robbery conviction because the events arose from the same transaction and all of the elements of assault and battery that occurred were required to prove the robbery. *Snowden*, 321 Md. at 615, 583 A.2d at 1058. The State countered that the shooting was a separate crime from the robbery and, therefore, the assault and battery conviction

should not merge. *Id.* After reviewing the proceedings from the trial court, we concluded, "We do not know whether the robbery charged was based on battery as a lesser included offense or on assault as a lesser included offense with the battery considered separate." *Snowden,* 321 Md. at 619, 583 A.2d at 1059. We held that, similar to our analysis in *Nightingale,* it was appropriate to resolve the factual ambiguity in Snowden's favor and to merge his conviction for assault and battery into the robbery conviction. *Snowden,* 321 Md. at 619, 583 A.2d at 1059–60.

The Court of Special Appeals relied on *Nightingale* and *Snowden* to resolve the merger issues presented in *Cortez v. State,* 104 Md.App. 358, 656 A.2d 360 (1995). In that case, the Court of Special Appeals confronted the issue of whether Cortez's battery conviction should merge with his conviction for fourth degree sexual offense. *Cortez,* 104 Md.App. at 360, 656 A.2d at 361. In its examination of the trial record, the intermediate appellate court surmised that the trial judge could have found Cortez guilty of battery on the basis of acts separate and distinct from the sexual offense, or he could have found that the battery was an integral part of the sexual offense. *Cortez,* 104 Md.App. at 368, 656 A.2d at 364–65. Taking into account this Court's analysis in *Nightingale* and *Snowden,* the Court of Special Appeals decided to resolve the factual ambiguity in Cortez's favor. *Cortez,* 104 Md.App. at 361, 367–68, 656 A.2d at 361, 364–65. The court ultimately concluded that, "because we cannot tell whether the trial judge *did* find that appellant committed a battery by the use of force separate and distinct from that used to commit the fourth degree sexual offense, we must resolve the doubt in favor of appellant and vacate the sentence for battery." *Cortez,* 104 Md.App. at 361, 656 A.2d at 361.

In the present case, the main thrust of Petitioner's argument on the issue of factual ambiguities in the record is that "the imposition of separate sentences for assault and resisting arrest was impermissible as the charging document, jury instructions, closing arguments, and verdict provide no clarification as to whether Petitioner's assault convictions are based

on acts different than those underlying his conviction for resisting arrest." Petitioner claims that the first acts that could have constituted a factual basis for convicting him of second degree assault were pushing Officer Anspach and striking Officer Burhoe outside Petitioner's home. According to Petitioner, the State's evidence was unclear as to when the decision to arrest him was made and when this decision was communicated to him. Furthermore, Petitioner asserts that the State's evidence at trial indicated that he potentially committed several additional assaults on the officers both inside the house and later in the encounter when he had been handcuffed and brought back outside. Petitioner maintains that because the record is ambiguous as to whether the jury convicted him of assault based on conduct that preceded or followed the initiation of the officers' attempt to arrest him, that ambiguity should be resolved in Petitioner's favor.

In its alternative argument, the State claims that the jury's guilty verdicts were based on separate and distinct acts committed by Petitioner; thus, according to the State, there is no ambiguity, and the convictions should not merge. The State asserts that the evidence adduced at trial clearly shows that Petitioner's "assault of Officer Anspach occurred during the early stages of an investigation of a hit-and-run, and certainly did not occur in the course of effectuating an arrest." Moreover, the State emphasizes the fact that Petitioner's assault on Officer Anspach provided the basis for the officers' decision to arrest him. The State contends that because the jury found Petitioner guilty of "resisting arrest, when initially placed under arrest for assaulting a police officer," the jury must have concluded that Petitioner committed an assault prior to any attempt to arrest him. Lastly, with regard to the assault on Officer Burhoe, the State posits, "The jury's finding that [Petitioner] was guilty of assaulting Officer Anspach and Officer Burhoe (but not Officer William Sands) is also consistent with a finding that the assault convictions related to conduct that occurred prior to the arrest and during the initial stages of the encounter when only Officer Anspach and Officer Burhoe were outside with [Petitioner]."

Upon reviewing the trial transcript, the judge's instructions to the jury, and the verdict sheet, we hold that the record is ambiguous as to the factual bases for which the jury found Petitioner guilty of second degree assault of Officer Anspach and Officer Burhoe. In our view, a reasonable jury could have found that the assaults were based on acts that preceded the officers' attempt to arrest Petitioner, or that the assaults were an integral part of the resisting arrest. In accordance with Maryland precedent, we must resolve this factual ambiguity in Petitioner's favor. Accordingly, the trial judge should have merged the assault convictions into the conviction for resisting arrest.

First, we address the facts surrounding the second degree assault of Officer Anspach. If the assault on Officer Anspach occurred prior to any attempt to arrest Petitioner, the conviction would not merge into the resisting arrest conviction; if the assault occurred during the resisting arrest, such that the convictions were based on the same underlying act or acts perpetrated by Petitioner, the offenses would merge. Officer Anspach testified that when he, Officer Burhoe, and Petitioner were initially outside for the purpose of investigating the alleged hit and run incident, Petitioner walked by him "kind of brushing [him] and just pushing [him]" with his arm. Officer Burhoe similarly testified that Petitioner pushed Officer Anspach as he turned to go back inside his home. It does not appear to be disputed that this alleged act occurred before any attempt was made to arrest Petitioner. If the jury believed that this event occurred, and that it occurred in the manner described by the officers, a reasonable jury could have concluded that the act constituted a second degree assault of Officer Anspach. Because Petitioner's testimony indicated that he did not in any way touch the officers, a reasonable jury could have also concluded that the event did not occur. Moreover, even if the jury did believe that the event occurred, a reasonable jury could have concluded that such an act did not constitute second degree assault; a reasonable jury could have determined, for instance, that the brush or push did not

constitute offensive physical contact or that the contact was accidental.

There is also ample testimony in the trial transcript of an extended scuffle between Petitioner and Officer Anspach after Petitioner re-entered his home. Although it is unclear from the record exactly when the attempt to arrest Petitioner began, both Officer Anspach and Officer Burhoe testified that they communicated to Petitioner that he was under arrest when he re-entered his home. Testimony was produced that, during the "fight" inside Petitioner's home, Petitioner hit, pushed, and shoved Officer Anspach. Officer Anspach testified that the injuries he sustained as a result of this struggle caused him to seek medical attention. A reasonable jury could have found that the events that occurred inside Petitioner's home, during the course of the resisting arrest, constituted a second degree assault on Officer Anspach. In light of the fact that either the events that occurred outside or the events that occurred inside could have led the jury to find Petitioner guilty of second degree assault on Officer Anspach, we resolve the factual ambiguity in Petitioner's favor. Thus, we hold that Petitioner's conviction for second degree assault of Officer Anspach merges into his conviction for resisting arrest.

The State raises the point in its Brief that the jury must have found that one of the assaults preceded the officers' attempt to arrest Petitioner. The State claims that Petitioner's assault of Officer Anspach was the basis for the officers' decision to arrest Petitioner. Furthermore, count one on the verdict sheet contained the offense of "resisting arrest, when initially placed under arrest for assaulting a police officer." According to the State, when the jury found Petitioner guilty of count one, it must have concluded that Petitioner committed an assault prior to his arrest. We disagree with the State's contentions, and we conclude that the jury need not have found that Petitioner committed an assault prior to any attempt to arrest him. In addition to count one on the verdict sheet, which contained the offense of "resisting arrest, when initially placed under arrest for assaulting a police officer," there were two other resisting arrest charges presented to the

jury for consideration; a reasonable explanation for the presence of a description of the resisting arrest charge in count one was to differentiate it from the factual bases underlying the other resisting arrest charges. Moreover, in order to find Petitioner guilty of resisting arrest, the jury only needed to find that the officers had reasonable grounds to believe that Petitioner was committing or had committed a crime; the jury did not need to find that Petitioner had *actually* committed a crime.

Next, we discuss the ambiguity surrounding the factual basis underlying Petitioner's conviction for second degree assault of Officer Burhoe. Similar to our analysis of the assault of Officer Anspach, if the assault of Officer Burhoe preceded any attempt to arrest Petitioner, then the assault conviction does not merge, and if the assault of Officer Burhoe occurred as a part of the resisting arrest, then the convictions merge. Both Officer Anspach and Officer Burhoe testified that, after Petitioner pushed or shoved Officer Anspach, he immediately walked up to Officer Burhoe and hit him in the face. A reasonable jury, if it believed the officers' testimony, certainly could have concluded that this act constituted a second degree assault of Officer Burhoe. As previously discussed, however, it is ambiguous whether any attempt had been made to effectuate an arrest of Petitioner at the time when he allegedly hit Officer Burhoe. Officers Anspach and Burhoe both testified that after Petitioner pushed Officer Anspach, a decision was made to arrest him for assaulting a police officer. According to Officer Burhoe, after Petitioner pushed Officer Anspach and continued to walk toward the house, Officer Burhoe put his arm up in an attempt stop Petitioner from entering his home. A reasonable jury could have concluded that this event began the officers' attempt to effectuate an arrest and, thus, the assault on Officer Burhoe occurred during the resisting arrest. A reasonable jury also could have concluded that the officers' attempt to arrest Petitioner did not begin until after the assault on Officer Burhoe. Again, we resolve this factual ambiguity in Petitioner's favor, and we hold that Petitioner's conviction for second

degree assault of Officer Burhoe should be merged into the conviction for resisting arrest.

Officer Burhoe also offered testimony at trial that he suffered an injury later in the encounter, after Petitioner had been handcuffed and several officers were attempting to put him in a police cruiser. According to Officer Burhoe, Petitioner continued to resist and, in an attempt to get Petitioner to the ground, Officer Burhoe "flipped" Petitioner, injuring his back in the process. Officer Burhoe indicated that his injury would not have occurred had Petitioner not continued to resist arrest. A reasonable jury could have found that this act constituted second degree assault of Officer Burhoe. This incident provides additional evidence of ambiguity in the record and further supports our conclusion that Petitioner's conviction for assault of Officer Burhoe should be merged with his conviction for resisting arrest.

### Jury Notes

██ We recently decided the case of *Black v. State,* 426 Md. 328, 44 A.3d 362 (2012) (No. 88, September Term, 2011) (filed May 3, 2012), which involves facts that are indistinguishable from the jury note facts before us in the instant case. Therefore, the law as we stated it in *Black* is controlling in these circumstances. In accordance with the principles declared in *Black,* we hold that there is a presumption of regularity in court proceedings, and Petitioner in this case has not produced a sufficient factual record on appeal to rebut that presumption by establishing that the jury note at issue was received by the trial court within the contemplation of Maryland Rule 4–326(d). Because Petitioner has not established a prima facie case that the Fourth note was received by the trial court, within the meaning of Rule 4–326(d), we affirm the intermediate appellate court's determination that Rule 4–326(d) was not triggered.

Maryland Rule 4–326(d), which governs communications between a jury and the trial court, provides:

(d) **Communications with jury.** The court shall notify the defendant and the State's Attorney of the receipt of any

communication from the jury pertaining to the action as promptly as practicable and in any event before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action. The clerk or the court shall note on a written communication the date and time it was received from the jury.

In *Black*, we began our analysis with a discussion of the appropriate standard of review and a summary of relevant principles of construction used to interpret and apply the Maryland Rules:

> To determine the existence of reversible error, ordinarily we conduct two inquiries: (1) whether an error occurred in the trial court; and (2) if so, whether that error was harmless beyond a reasonable doubt. *See Stewart v. State,* 334 Md. 213, 228, 638 A.2d 754, 761 (1994); *Noble v. State,* 293 Md. 549, 558, 446 A.2d 844, 848 (1982); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). With respect to the first inquiry, we have held that "[t]here is a presumption of regularity which normally attaches to trial court proceedings, although its applicability may sometimes depend upon the nature of the issue before the reviewing court." *Harris v. State,* 406 Md. 115, 122, 956 A.2d 204, 208 (2008) (citations omitted). To overcome the presumption of regularity or correctness, the appellant or petitioner has the burden of producing a "sufficient factual record for the appellate court to determine whether error was committed." *Mora v. State,* 355 Md. 639, 650, 735 A.2d 1122, 1128 (1999); *State v. Chaney,* 375 Md. 168, 184, 825 A.2d 452, 461 (2003); *Bradley v. Hazard Tech. Co.,* 340 Md. 202, 206, 665 A.2d 1050, 1052 (1995). If the appellant or petitioner demonstrates that error occurred, the burden rests with the State to establish that the error was harmless beyond a reasonable doubt. *Dorsey,* 276 Md. at 658, 350 A.2d at 677.

> \*     \*     \*

> In interpreting the Maryland Rules, we have stated that "we use the same well-established canons of construction that we use when interpreting statutes." *Perez v. State,* 420

Md. 57, 63, 21 A.3d 1048, 1052 (2011) (quotation omitted); *State ex rel. Lennon v. Strazzella*, 331 Md. 270, 274, 627 A.2d 1055, 1057 (1993). We "look to the plain meaning of the language employed in the[ ] rules and construe that language without forced or subtle interpretations designed to limit or extend its scope." *Lee v. State*, 332 Md. 654, 658, 632 A.2d 1183, 1185 (1993). We avoid a construction of a rule or statute that is unreasonable, illogical, or inconsistent with common sense. *Gwin v. MVA*, 385 Md. 440, 462, 869 A.2d 822, 835 (2005). We construe statutes and rules as a whole "so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Moore v. State*, 388 Md. 446, 453, 879 A.2d 1111, 1115 (2005) (citation omitted).

*Black*, 426 Md. at 337–39, 44 A.3d 367–68.

We then summarized basic principles pertaining to communications between the trial court and the jury:

The rules governing communications between the judge and the jury are basic and relatively simple to adhere to in practice. If a judge receives a communication from the jury or wishes to communicate with the jury, he or she is required to notify the parties. *See* Md. Rule 4–326(c). The communication with the jury shall be made in open court on the record or shall be made in writing and the writing shall become part of the record. *See* Md. Rule 4–326(c). Putting aside certain exceptions not relevant here, the defendant has a recognized right to be present during communications between the judge and the jury during [the] trial. *See* Md. Rule 4–231(b); *Stewart v. State*, 334 Md. 213, 224–25, 638 A.2d 754, 759 (1994); *Williams v. State*, 292 Md. 201, 211, 438 A.2d 1301, 1306 (1981) ("a criminal defendant's right to be present at every stage of his trial is a common law right [and] is to some extent protected by the Fourteenth Amendment to the United States Constitution"). These rules are not abstract guides. They are mandatory and must be strictly followed. *See Taylor v. State*, 352 Md. 338, 344, 722 A.2d 65, 68 (1998); *Stewart*, 334 Md. at 222, 638 A.2d at 758. (Footnote omitted.)

*Black,* 426 Md. at 339, 44 A.3d at 368–69 (quoting *Winder v. State,* 362 Md. 275, 322, 765 A.2d 97, 122–23 (2001)). We explained the *Winder* Court's discussion of Rule 4–326(c) by noting that the subsection of the Rule discussing communications with the jury was previously subsection (c) and, through a 2003 amendment, is currently subsection (d). *Black,* 426 Md. at 339 n. 2, 44 A.3d at 369 n. 2.

Our review of the plain language of Rule 4–326(d) led us to conclude that the requirements of that subsection are not triggered unless the appellant or petitioner produces a sufficient factual record to establish that the trial court actually received the communication at issue. *Black,* 426 Md. at 341, 44 A.3d at 370. Furthermore, we maintained that, to trigger the mandates of subsection (d), the communication must have been received by the trial court prior to the jury's rendition of the verdict. *Black,* 426 Md. at 341, 44 A.3d at 370. We determined that receipt by the "court," as contemplated by the Rule, includes "the trial judge and all court personnel who are subject to the direction and control of the judge, including, but not limited to, the courtroom clerk, the judge's law clerk, and the bailiff." *Black,* 426 Md. at 342, 44 A.3d at 370. The April 2005 amendment to Rule 4–326(d), requiring that written communications to or from a jury be dated and time-stamped and that the time of any oral communications be noted in the record, led us to conclude:

"There is a strong presumption that judges and court clerks, like other public officers, properly perform their duties." *Schowgurow v. State,* 240 Md. 121, 126, 213 A.2d 475, 479 (1965) (citing *Lewis v. United States,* 279 U.S. 63, 73, 49 S.Ct. 257, 260, 73 L.Ed. 615, 619 (1929)). This presumption of regularity is rebuttable. *Harris v. State,* 406 Md. 115, 122, 956 A.2d 204, 208 (2008). Thus, there is a presumption, under Rule 4–326(d), that written jury communications that are received by the trial court will be dated and time-stamped and that the time of any oral communications will be noted in the record. Furthermore, we interpret the requirements contained in that Rule and the presumption of regularity to mean that when a purported jury note found in the appellate record is not dated or time-

stamped, nor is the time of any oral communication noted in the record, there is a rebuttable presumption that the trial court did not receive the communication. The burden is on the petitioner or appellant to overcome the presumption of regularity in a situation where there is no date or time-stamp on the jury note and there is no indication in the record that the trial court addressed, or otherwise responded to, the communication.

*Black,* 426 Md. at 342, 44 A.3d at 370–71.

We discussed the circumstances presented in *Denicolis v. State,* 378 Md. 646, 837 A.2d 944 (2003) and *Fields v. State,* 172 Md.App. 496, 916 A.2d 357 (2007), concluding that the facts surrounding the jury notes in those cases were distinguishable from Note four in *Black. See Black,* 426 Md. at 336–37, 44 A.3d at 367. In both *Denicolis* and *Fields,* the courts concluded that the jury notes at issue, which were included in the court records and had been marked as court exhibits, were received by the respective trial courts within the contemplation of Rule 4–326(d). *See Denicolis,* 378 Md. at 658, 837 A.2d at 951; *Fields,* 172 Md.App. at 516, 916 A.2d at 369. In addition to the trial judge's attestation in *Black* that he did not receive the note at issue, we determined:

[I]t is reasonable for us to conclude, based on the appellate record produced by Petitioner, that no other court personnel received the Note prior to the discharge of the jury. Unlike the circumstances in *Denicolis,* where a member of the court staff marked the jury note as a court exhibit, the Note in the instant case contains no indication that any court personnel received it. The lack of any notations on Note four indicating receipt and the assertion in the trial judge's affidavit that he did not receive the note, raise a rebuttable presumption that Note four was not received by the court. Notations on a jury communication, including, but not limited to, a date and time-stamp, a signature by the judge, or a marking indicating that a document is a court exhibit, can rebut that presumption. Accordingly, Petitioner has failed to produce a sufficient appellate record to rebut the presumption of regularity.

Moreover, for Note four to have been "received," and for it to have any relevance, it must have been received prior to rendition of the jury's verdict. In other words, it must have been received before or during the jury's deliberations, at a time when the trial court could have responded to the communication. For, as we have often stated, information contained in the jury room and discovered or made known after the verdict has been rendered may not be used to impeach the jury's verdict. *See Stokes v. State,* 379 Md. 618, 637, 843 A.2d 64, 75 (2004) (concluding that "[i]t would be a most pernicious practice, and in its consequences dangerous to this much valued mode of trial, to permit a verdict, openly and solemnly declared in the [c]ourt, to be subverted by going behind it and inquiring into the secrets of the jury room" (quotation omitted)); *Williams v. State,* 204 Md. 55, 70, 102 A.2d 714, 721 (1954) (holding that "[i]n Maryland there has been no deviation from the rule that what takes place in the jury-room ought to be, as it generally is, known only to the jurors themselves and that their testimony cannot in general be heard to impeach their verdict" (citation omitted)). In this case, the record is devoid of any evidence, including any statements by the trial judge, trial counsel, or anyone else present at the trial, to support the conclusion that the jury sent a substantive note, namely Note four, to the court before or during deliberations. If Note four had been dated or time-stamped, this fact could have overcome the presumption that the note was not received by the court before the jury rendered its verdict. Dates and time-stamps can confirm how much time elapsed between receipt of any jury note and the jury's agreement on a verdict. In addition, a notation on a jury note, such as a marking by the judge, a law clerk, or a courtroom clerk, can raise a presumption regarding the trial court's receipt, thereby removing any ambiguity or doubt from the record.

*Black,* 426 Md. at 343–44, 44 A.3d at 371–72.

Lastly, in *Black,* we addressed the issue, raised in *Denicolis,* of whether the petitioner's ability to establish the circum-

stances surrounding the trial court's receipt of the note in question was hampered in any way. *Black,* 426 Md. at 344, 44 A.3d at 372. We opined that, although the petitioner's appellate counsel in *Black* had made an effort to obtain affidavits from the trial judge and trial counsel regarding Note four, there was no adequate explanation given for the absence of affidavits from other court personnel who may have had knowledge of Note four's presence in the record. *Black,* 426 Md. at 344–45, 44 A.3d at 372. We concluded that the petitioner did not establish sufficiently that his ability to produce a record on appeal regarding the court's receipt of Note four was hampered. *Black,* 426 Md. at 345, 44 A.3d at 372. Ultimately, we held that the petitioner in *Black* had failed to provide a sufficient record on appeal to rebut the presumption of regularity and to establish that Note four had been received by the trial court. *Black,* 426 Md. at 343, 44 A.3d at 371.

In the instant case, Petitioner contends that the facts surrounding the Fourth note are similar to the facts presented in *Denicolis* and *Fields.* According to Petitioner, "[w]hile the fact that a note is marked as a court exhibit is evidence that the court received it, so too does the fact that the court (defined broadly to include court personnel) placed the note in the record." Thus, Petitioner claims, the trial court in this case received the Note at issue and failed to disclose it to him and his counsel as required by Rule 4–326(d).

Contrary to Petitioner's assertions, the State maintains that Petitioner failed to meet his burden of producing a sufficient record on appeal to establish that the trial court received the Note, thereby triggering the requirements of Rule 4–326(d). The State claims that "unlike in *Denicolis* and *Fields,* where [a note labeled as a court exhibit] was found to be prima facie evidence that the note had been received by the trial court, there is no such label (or any marking) in this case, and thus no indication that Note 4 was actually received by the trial court." Positing that receipt by the court would only be relevant if it occurred prior to the jury's rendition of the verdict, the State further asserts that Petitioner failed to establish a prima facie case that the Note at issue, if it was

received at all, was received prior to announcement of the verdict in open court.

This case is analogous to the circumstances presented in *Black*. Here, an unexplained and unmarked jury note located in the record was discovered by Petitioner's appellate counsel well after the jury had rendered its verdict and been discharged. While the other three jury notes located in the record include a response, a date and time, and the judge's apparent signature, the Fourth note contains no markings whatsoever to indicate receipt by the court. In addition, the trial transcript contains a record of the discussions between the trial judge, the prosecutor, and Petitioner's trial counsel pertaining to the three answered jury communications. The record contains no mention of the Fourth note, other than the presence of the Note itself in an envelope in the court file. Additionally, the trial judge, the prosecutor, and Petitioner's trial counsel all affirmatively indicated that they had no recollection of the Fourth note.

As we stated in *Black,* there is a presumption of regularity in trial court proceedings. *Black,* 426 Md. at 337, 44 A.3d at 368. In accordance with the mandates of Rule 4–326(d), a written jury communication that is received by the court *shall* be dated and time-stamped. Thus, there is a presumption under the Rule that a note that has been received by the court, including the trial judge or any court personnel, will contain a date and time-stamp. Furthermore, the trial judge in this case indicated that his usual practice upon receiving a communication from the jury is to convene with counsel on the record to discuss possible responses and, thereafter, to provide a response on the note itself, along with a date and time. The Fourth note in this case was not dated or time-stamped, in accordance with Rule 4–326(d) and the trial judge's usual practice, thus raising the presumption that the Note was not received by the court. Petitioner has failed to produce a sufficient record to rebut this presumption by establishing a prima facie case that the court did, in fact, receive the jury Note at issue and that such receipt occurred prior to the jury's rendition of the verdict.

Furthermore, not unlike the circumstances in *Black,* there is no indication that Petitioner's efforts to establish a sufficient record on appeal were hampered. Although Petitioner claims that obtaining affidavits from courtroom personnel, in addition to the trial judge and trial counsel, "is an impossible burden and, in any case, is likely to provide no additional insight into how a note got into the record," we disagree with this assertion. Similar to our conclusions in *Black,* a plausible explanation for the existence in the record of the Fourth note in this case is that all papers that were left in the jury room following rendition of the verdict and discharge of the jury were placed in a single envelope, including notes that had been presented to the judge for a response and notes that had not left the jury room during the trial or deliberations. An inquiry directed toward various court personnel who may have come in contact with the Note in question certainly could have provided an explanation for the Note's presence in the record. Thus, we are not convinced that no better record than the one presented by Petitioner could have been made for purposes of appeal.

Upon reviewing the record, we agree with the Court of Special Appeals that Petitioner failed to produce a sufficient record to rebut the presumption of regularity by establishing that the trial court actually received the Fourth note. Thus, the trial court's responsibilities under Rule 4–326(d) were never triggered.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED IN PART AND REVERSED IN PART. SENTENCES FOR ASSAULT CONVICTIONS IN COUNTS 3 AND 4 VACATED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

BELL, C.J., concurs and dissents.

BELL, C.J., concurring and dissenting.

While I agree with the majority that the trial court erred when it failed to merge the petitioner's conviction for second degree assault into his conviction for resisting arrest, pursuant to the required evidence test, for the reasons set forth in detail in my dissenting opinion in *Black v. State,* 426 Md. 328, 346, 44 A.3d 362, 373 (2012), I dissent from its holding that the petitioner failed to produce sufficient evidence of the court's non-compliance with Maryland Rule 4–326(d).