*Stanley Charles Butler, Jr. v. State of Maryland*. Case Number 1037, Sept. Term 2021
*Opinion by Wells, C.J.*

**CRIMINAL LAW – FIFTH AMENDMENT – SUPPRESSION – DEFENDANT'S BURDEN**

Even though a private citizen may be deemed an "agent of the State" for the purposes of evaluating an alleged violation of the Fifth Amendment's protection against self-incrimination, a defendant bears the burden of proving that such a citizen was, in fact, acting as an agent of law enforcement when that person questioned the defendant. Here, Butler failed to demonstrate that an Emergency Medical Technician (EMT), who asked Butler about his injuries as he was transported to a hospital after arrest and with a law enforcement officer present, was acting as an agent of the police rather than merely providing medical treatment.

**CRIMINAL LAW – DISARMING A LAW ENFORCEMENT OFFICER – SUFFICIENCY OF THE EVIDENCE**

Section 4-103(b) of the Criminal Law Article provides that a person may not knowingly remove or attempt to remove a firearm from the possession of a law enforcement officer if the officer is lawfully acting within the scope of his employment and the person knows or has reason to know that the law enforcement officer is, in fact, a law enforcement officer. In this case, the testimony and video evidence presented at Butler's trial offered sufficient evidence for a jury to conclude that he tried to disarm a uniformed police officer.

**CRIMINAL LAW – MERGER – SECOND DEGREE ASSAULT AND RESISTING ARREST**

Relying on the holdings in *Britton v. State*, 201 Md. App. 589, 604 (2011) and *Purnell v. State*, 375 Md. 678, 698 (2003), we hold that contrary to Butler's assertion, *Nicolas v. State*, 426 Md. 385 (2012) did not establish a bright line rule that a second-degree assault conviction automatically merges with a resisting arrest conviction if the assault took place after the initiation of an arrest and before the defendant was placed into custody. Where, as here, the evidence establishes that separate acts underlie second-degree assault and resisting arrest, separate convictions may be sustained, and merger is not required.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1037

September Term, 2021

_____

STANLEY CHARLES BUTLER, JR.

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Beachley,
Salmon,
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Wells, C.J.

_____

Filed:  August 31, 2022

This appeal arises from the tumultuous arrest of appellant, Stanley Charles Butler, during which he initially fled from law enforcement officers, and when apprehended, assaulted several of them. After being taken into custody and upon being transported to receive medical care, an emergency medical technician (EMT) asked Butler about how he became injured. A police officer was also present in the ambulance. In response to one question the EMT asked him, Butler said that he "should not have went for that weapon."

Butler was ultimately charged with disarming a law-enforcement officer, assault on a law-enforcement officer, two counts of second-degree assault, and resisting arrest. He moved to suppress his statement made in the ambulance, asserting that it was obtained in violation of his Fifth Amendment right against compelled self-incrimination, as he had not been advised of his *Miranda*[1] rights. The suppression court denied his motion. A jury subsequently convicted Butler on all counts, and, over counsel's objection to merge one of the second-degree assault convictions with resisting arrest, the trial court sentenced him to a total of 23 years' imprisonment.

Butler timely appealed, presenting three issues for our review[2]:

1. Did the lower court err in denying Mr. Butler's motion to suppress his statement?

2. Was the evidence insufficient to support Mr. Butler's conviction for disarming a law enforcement officer?

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] We have kept Butler's questions verbatim but reordered them to match the chronology of events in the court below.

3. Did the lower court err in refusing to merge Mr. Butler's convictions for second degree assault under Md. Crim. Law Art. 3-203(a) into his conviction for resisting arrest?

For the foregoing reasons, we answer 'no' to each and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Arrest**

On July 31, 2020, at approximately 9:00 am, two Easton police officers and a Talbot County Sheriff's deputy responded to a call regarding a car that had been parked for nearly a day in an Easton cemetery. Deputy Donald Johnson was asked to go to the scene with his K-9 partner, Cairo. On arrival at the cemetery, Deputy Johnson heard Easton Police dispatch confirm that there was an active arrest warrant for the car's driver, Stanley Butler. The Easton officers informed Butler of the warrant and requested that he exit his vehicle. Instead of complying, Butler drove off. A high-speed chase ensued, initially with only Deputy Johnson in pursuit, but additional officers joined the chase as the vehicles left Talbot County. By the time Butler's car reached Cambridge, another group of officers, including those from Dorchester County, had placed STOP STICKs[3] in the roadway to deflate Butler's car's tires. Butler's car hydroplaned as its tires deflated and the car skidded onto someone's front yard.

Butler, Deputy Johnson, Sergeant Gary Blades of the Dorchester County Sheriff's Office, and Cambridge Police Officer Kason Washington all exited their vehicles and

---

[3] According to STOP STICK's website, "STOP STICK is the world's leading tire-deflation device for high-speed pursuits." "Teflon®-coated quills penetrate the tire and act as valves, releasing air at a safe, controlled rate." www.stopstick.com.

2

Deputy Johnson ordered Butler "to get on the ground." Butler did not comply and moved as if to run, but then "turn[ed] around and face[d Deputy Johnson] and ball[ed] his fists up," at which point Deputy Johnson expected that a "confrontation was about to ensue, that [Butler] was not going to comply." Deputy Johnson ran towards Butler to try to subdue him, but Butler "drop[ped] his shoulder down almost like a football tackle," and Deputy Johnson rebounded off him, landing on the ground. Deputy Johnson tried to lunge upward, but Butler caught him in a headlock and punched him in the jaw with a closed fist.

Officer Washington then ran at Butler and punched him in the face, diverting Butler's attention from Deputy Johnson. Butler grabbed Officer Washington around the waist and fell forward on top of him "in a tackling motion." Officer Washington began "yelling for [Butler] to get off" and "throwing punches at [Butler's] face." Butler was more than twice Officer Washington's size. [4] Butler then began to fight with Deputy Johnson and Sergeant Blades, who were trying to pry Butler off Officer Washington. After several seconds, Deputy Johnson was able to pull Butler off Officer Washington, who was able to break free.

Butler spun around to face Deputy Johnson and began "throwing small jabs" into his side, at which point Deputy Johnson advised another officer at the scene, Cambridge Police Pfc. Joseph Buglio, to tase Butler's exposed back. Pfc. Buglio had been trying unsuccessfully to place Butler's left arm behind his back to "get him into custody." Pfc.

---

[4] Officer Washington testified that he weighs approximately 145 pounds, and according to his driver's license, Butler weighs approximately 310 pounds.

Buglio tased Butler, but to no effect; he tased Butler again with a second cartridge, but again, the taser was ineffective.

At this point, Deputy Johnson "couldn't hold on any longer" to Butler, so he moved "up to the next level" on the "force continuum" to "strike [Butler] with a closed fist into the left side of his face." Several officers, including Sergeant Blades, Officer Washington, Pfc. Buglio, and Cambridge Police Officer Jones were "trying to get [Butler] to place his hands behind his back and stop actively resisting, to be placed under arrest," while Deputy Johnson returned to his vehicle to retrieve K-9 Cairo.

When Deputy Johnson returned with Cairo, he positioned Cairo near Butler's back below the right shoulder and ordered him to bite. The dog[5] was only able to get a grip on Butler's right arm. Butler used "his left hand and trie[d] to swipe [Deputy Johnson's] feet out from underneath [him] and [wa]s still actively resisting at this time." Deputy Johnson "came back with another hard hand hit to [Butler's] left side of the face," and another officer was able to get a handcuff on Butler's right hand.

Deputy Johnson ordered Cairo to release the bite, and brought Cairo around to Butler's left side, where Butler had his left arm "tucked up underneath of him at this point where he is still not giving officers his hand, his left hand." Deputy Johnson's idea was to have Cairo "bite[] the same area on this side [so that Butler's] hand will swing out and [they would] actually be able to subdue [Butler] and place him in handcuffs and restrain him." He gave Cairo a second bite command and Butler "still resisted for approximately

---

[5] Cairo is a 47-pound male Belgian Malinois with an approximately four-inch muzzle.

4

five to ten seconds," but when Butler "finally stopped moving his arms and resisting," officers were at last able to handcuff him and place him in custody.

**The Ambulance Ride**

Emergency medical service (EMS) providers then arrived on the scene. Officer Washington had "a bruised back and a bruised hip" from landing on his gun when Butler tackled him and was taken by another officer to the hospital. In addition to physical injuries, Butler was also reportedly experiencing "shortness of breath" and was EMS's "primary focus."

Butler was placed in an ambulance for transportation to Dorchester General Hospital along with EMT Keith English and Deputy Tracy Kilgore of the Talbot County Sheriff's Office, per police procedure for transporting someone in custody. Deputy Kilgore was wearing a uniform, duty belt, and firearm, and was present "mainly more in an observatory role" and neither made "any statement relative to the investigation" nor "ask[ed Butler] any questions."

EMT English, however, did ask Butler questions "to build some rapport with the patient as [he] would with anybody regardless of what [he is] picking them up for." English asked Butler: "How did we get here? Tell me about your medical history. Do you have any history of respiratory distress, any other preexisting health conditions that I need to be aware of?" After Butler "denied any serious medical history," English asked, "what's going on with the police, obviously there's a police chase," and asked about Butler's "pain in his extremities from the dog bites and also being kicked and tased. [English] said how did we get to that?" Butler replied, "I guess I should not have went for that weapon." English

5

responded, "that's not really my concern, I'm here for you, to provide patient care and to make sure we're okay. That is the police's business, I'm here for your safety and well-being from the time you're in my care until I get you to the hospital."

At Butler's remark about the weapon, Deputy Kilgore silently took out her cellphone and began recording. She never asked Butler any questions during the ambulance ride, about taking a weapon or about any other subject.

**Circuit Court Proceedings**

At a hearing on May 3, 2021 in the Circuit Court for Dorchester County, Butler moved to suppress his statement to English about going "for that weapon." The court denied the motion, concluding that although Butler was in custody while in the ambulance, EMT English was not an agent of the State for purposes of *Miranda*.

On May 5 and 6, Butler was tried by a jury and ultimately convicted of attempted disarming a law enforcement officer, one count of assault on a law enforcement officer under Md. Crim. Law Art. ("CR") § 3-203(c), two counts of second-degree assault on law enforcement officers under § 3-203(a), and a single count of resisting arrest. Butler was sentenced to 10 years' incarceration for the disarming conviction, a consecutive 10-year sentence for assaulting the second officer under § 3-203(c)[6], and a consecutive 10 years for second-degree assault against the first officer under § 3-203(a), all but five years suspended, and a concurrent three years for resisting arrest.

---

[6] The trial court merged Butler's conviction of second-degree assault against the second officer into his conviction for second-degree assault against a law enforcement officer.

6

At sentencing, Butler's trial counsel asked the trial court to merge Butler's conviction and sentence for second-degree assault against the first officer, under § 3-203(a), into his conviction for resisting arrest, arguing that the two convictions covered the same conduct. The trial court declined to merge, and this timely appeal followed.

## STANDARD OF REVIEW

When reviewing the denial of a motion to suppress, we look only to the record of the suppression hearing. *Lee v. State*, 418 Md. 136, 148 (2011). "We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion"—here, the State—and "defer to the motions court's factual findings and uphold them unless they are shown to be clearly erroneous." *Id.* (internal citations and quotation marks omitted). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of this case." *Id.* at 148–49.

When reviewing a challenge to the sufficiency of evidence to support a criminal conviction, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith v. State*, 415 Md. 174, 184 (2010) (quoting *Jackson v. Virginia*, 443 U.S. 307 (1979)) (emphasis in *Jackson*). "[W]e do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence. We defer to the jury's inferences and determine whether they are supported by the evidence." *Id.* at 185 (internal citations omitted).

Finally, when reviewing a trial court's decision whether to merge sentences, "we must examine whether the trial court's conclusions were legally correct under a *de novo* standard of review." *Clark v. State*, 246 Md. App. 123, 132 (2020) (citing *Blickenstaff v. State*, 393 Md. 680, 683 (2006)).

## DISCUSSION

### I. Motion to Suppress Butler's Statement

#### A. Parties' Contentions

Butler asserts that he was in police custody when EMT Keith English asked him "how did we get here," and that English's question was not for the purpose of medical diagnosis but instead was investigative and designed to elicit a response which could be incriminating. Thus, Butler says, English was acting as an agent of the police and his question amounted to a custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436 (1966). Because Butler had not been given *Miranda* warnings at that time, he concludes his response should have been suppressed.

The State counters that the suppression court's factual finding that English was not acting as a State agent is not clearly erroneous, and thus the procedural directives of *Miranda* were not implicated. The State points out that English testified that he asked Butler general, open-ended questions for the purpose of providing medical treatment, and because Butler's argument essentially attacks the credibility of that testimony, it must fail, as the weighing of credibility was a task for the suppression court. Moreover, the State adds, there was no evidence that Deputy Kilgore asked Butler questions herself, nor that

8

she directed English to ask any questions, which would generally be required to find a private citizen to be an agent of the police.

## B. Analysis

The Fifth Amendment to United States Constitution, applicable to the states through the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964); *Gonzalez v. State*, 429 Md. 632, 650 n.7 (2012), provides "that an individual cannot be compelled to be a witness against himself." *Miranda*, 384 U.S. at 479; U.S. Const. amend. V.[7] In recognition of this right, the Supreme Court has established that an accused individual "must be adequately and effectively apprised of his rights" when in custody of law enforcement and prior to interrogation. *Miranda*, 384 U.S. at 467–68; *Reynolds v. State*, 88 Md. App. 197, 208–09 (1991), *aff'd*, 327 Md. 494 (1992). Inherent in this is that the right against compelled self-incrimination—and thus to receive *Miranda* warnings prior to custodial interrogation—is triggered only by State action, and specifically, that of law enforcement officials. *Id.* at 444; *Paige v. State*, 226 Md. App. 93, 107–08 (2015); *Reynolds*, 88 Md. App. at 204. "This is due to the Supreme Court's recognition that '[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect

---

[7] Article 22 of Maryland's Declaration of Rights also provides a right against compelled self-incrimination. Although the contours of this state constitutional right and the federal constitutional right are similar, they are not identical. See generally Andrew V. Jezic, Patrick L. Woodward, E. Gregory Wells & Kathryn Grill Graeff, *Maryland Law of Confessions* §§28.11, 28.17 (2021-2021 ed.). Here, however, Butler makes no independent argument under Article 22, so we analyze his claim solely under the 5th Amendment.

9

to be charged with a crime.'" *Paige*, 226 Md. App. at 107 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

However, as Butler correctly points out, a private citizen may sometimes be deemed an agent of the State (i.e., law enforcement, in the case of the right against compelled self-incrimination) such that he or she implicates an accused's constitutional rights. Maryland case law has established this to be the case when the so-called private citizen is a "special police officer"—an individual "vested with arrest or other police powers"—or otherwise, is an individual "working under the direction of, or in concert with, law enforcement officers." *Id.* at 112 (quoting Andrew V. Jezic, Frank Molony, William E. Nolan & Hon. Patrick L. Woodward, *Maryland Law of Confessions* § 10:7 at 466 (2014–2015 ed.)); *Pratt v. State*, 9 Md. App. 220, (1970) (holding that a security officer who testified he was a sworn and appointed law enforcement officer was a law enforcement officer for purposes of the Fifth Amendment and *Miranda* when he questioned an accused shoplifter about taking merchandise); *Waters v. State*, 320 Md. 52, 59–60 (1990) (holding that a private security guard was not a law enforcement officer for purposes of effecting a search under the Fourth Amendment, since the security guard was neither vested with police powers, nor was there evidence he "was working in collusion with the police at the time of the search, or otherwise acted as an instrument of the State in the performance of his duties"). In *Paige*, this Court held that a private security guard working at a department store was not acting as a State agent when she interviewed a suspected shoplifter, as she "did not have any arrest powers or other duties associated with typical law enforcement," and there was no evidence that the police officer who responded to the guard's call and was present

10

for her interview of the accused "directed the private security guards in their actions in obtaining the written admissions from appellant." *Id.* at 112, 115. This Court also noted that the police officer himself did not interview or ask the appellant any questions. *Id.* at 115.

It was Butler's burden at the suppression hearing to demonstrate he was entitled to *Miranda* warnings, requiring that he prove both that he was in police custody at the time English questioned him, and that English's questioning amounted to police interrogation. *Paige*, 226 Md. App. at 107. The evidence established at the suppression hearing consisted of the following: English testified that when he was dispatched to the scene, he was informed only that there was a traumatic injury. Upon arrival, it was clear to English that there had been a multi-vehicle collision, and he observed "signs that [Butler] had been bitten by a police dog," and that Butler had taser wires still attached to him. English also saw that Butler was in handcuffs, and that Butler "looked as if he had exerted himself, . . . sweating a little bit." English asked Butler questions in the ambulance in order to "build some context around how we got here," because it would inform how English was to provide care. English testified about his interaction with Butler:

> I just, you know, I said how did we get here, how did we get to be tased and bitten by a police dog. And there was a comment about I guess I shouldn't have went for the gun, I believe were his words. No context around it, whose, whether it was his or anybody else's or where it was. And I just said, look, you know, over the course of this I am not the police, that is not my business, I'm here to treat you and make sure you're okay.

English also testified that there was no police interaction with Butler during their conversation.

Officer Tracy Kilgore, who rode in the ambulance with English and Butler, testified that she "happened to jump in as the passenger in a patrol car" that joined the pursuit of Butler. At that time, she did not know what the pursuit was about. Officer Kilgore said she rode along in the ambulance with Butler and English because it is customary for police to ride along in an ambulance with someone in custody. She testified that she was to do nothing more than provide protection if Butler "acted up or gave EMS any problem." She admitted that at the time Butler was in the ambulance, there was no question that he was in custody. At that time she was wearing a uniform and a duty belt with a firearm which designated her as law enforcement. Officer Kilgore testified that she did not ask Butler any questions and she could not recall any of the specific questions English asked Butler, but she did overhear Butler's response to one question that he "started to go for his gun." At that time, she took out her cellphone and began recording, but she continued to refrain from asking Butler anything or stating anything herself.

Based on this evidence the court found that Butler was in custody at the time of being taken in the ambulance, but that "there's no indication that the EMT was a State actor," and so "there was no interrogation in the way that was contemplated by the law." The court reasoned that EMTs are "civilians, they are not commissioned police officers . . . They are independent," and that Officer Kilgore did not ask Butler any questions or direct English to ask Butler any questions.

We reach the same conclusion as the circuit court in holding that English was not a State agent. First, we review the circuit court's underlying factual findings for clear error. Viewing the evidence in the light most favorable to the State, it was not clear error for the

12

suppression court to find that EMTs are not commissioned police officers, nor was it clear error for the court to have credited English's testimony that his question to Butler was aimed only at providing medical care. Nor was it clear error for the court to have found that Officer Kilgore was not involved in, nor did she direct or in some way influence, English's questioning. Butler's only argument below was that English could have had no purpose other than to elicit incriminating information from him in asking "how we got here," because, in Butler's view, English was already aware of the events that led to Butler's injuries. But Butler presented no evidence to support this contention. Indeed, English testified to the contrary. Consequently, the suppression court made a credibility determination about English's motivation. Under the circumstances, we cannot say that court's decision to credit English's testimony was clearly erroneous.

Next, we independently apply the relevant law to these facts. As stated, our case law has established that a private citizen may have acted as a State agent for purposes of the Fifth Amendment and entitlement to *Miranda* warnings where that citizen is a special police officer or acts at the direction of law enforcement officers in carrying out questioning of the accused. Because the suppression court expressly found neither condition satisfied and did not clearly err in doing so, we hold it was legally correct in concluding that English was not acting as a State agent. It follows that English's question to Butler did not amount to interrogation; therefore, we conclude that *Miranda* warnings were not required.

We note that Butler goes beyond Maryland case law and cites a 'test' that has been applied by the Seventh, Eighth, Ninth, Tenth, and Eleventh federal circuits for assessing what "degree of governmental participation is necessary before a private citizen is

13

transformed into an agent of the State." *United States v. Walther*, 652 F.2d 788, 791 (9th

Cir. 1981). The Ninth Circuit presented this assessment:

> [T]wo critical factors in the 'instrument or agent' analysis are: (1) whether
> the government knew of and acquiesced in the intrusive conduct, and (2)
> whether the party performing the search intended to assist law enforcement
> efforts or to further his own ends.

*Id.* at 791–92. This approach appears to have been used primarily in the context of

analyzing searches under the Fourth Amendment, and indeed, our Court of Appeals

assessed these two factors in *State v. Collins*, 367 Md. 700 (2002), holding that the

participation of a police officer in two bail bondsmen's entry and search of Collins' home

transformed the encounter into "State action" for purposes of the Fourth Amendment. *Id.*

at 717.

Even if we were to formally adopt *Walther*'s two-part inquiry, we would not

conclude that Butler has shown that either prong applies here, particularly the second, for

which there is no evidence in the record whatsoever. Consequently, even were we to adopt

*Walther*'s test, the evidence adduced at the hearing would not warrant reversing the

suppression court's finding of no State action. Viewing the evidence in the light most

favorable to the State, the suppression court's finding that English questioned Butler to aid

in providing him medical treatment—not to assist the police—was not clearly erroneous.

## II. Sufficiency of Evidence for Disarming a Law Enforcement Officer

### A. Parties' Contentions

Butler contends that his motion for judgment of acquittal of attempting to disarm a

law enforcement officer under Criminal Law Article (CR) § 4-103 should have been

granted, as there was no evidence Butler had the requisite specific intent to remove Deputy Johnson's weapon from his person. The only evidence presented of this was Butler's statement that he should not have gone for the officer's gun, and a photograph taken from Deputy Johnson's body camera footage showing Butler's hand on Deputy Johnson's firearm. According to Butler, neither of these pieces of evidence—even if accepted by the jury—establish that Butler was "consciously attempting to gain control of that weapon." The State counters that in viewing the evidence in the light most favorable to it, the evidence was sufficient to permit the jury to infer—as was its prerogative—that based on Butler's statement and the photograph of his hand on the officer's weapon, he was attempting to disarm the officer.

**B. Analysis**

Section 4-103(b) of the Criminal Law Article provides that

> (b) A person may not knowingly remove or attempt to remove a firearm from the possession of a law enforcement officer if:
> (1) the law enforcement officer is lawfully acting within the course and scope of employment; and
> (2) the person has knowledge or reason to know that the law enforcement officer is employed as a law enforcement officer.

Butler's argument on appeal challenges only the evidence supporting his "knowing" attempt to remove Deputy Johnson's firearm. He does not challenge either condition of subparagraphs (1) or (2) of CR § 4-103(b).

Butler is correct that an "attempt to remove a firearm from the possession of a law enforcement officer," as an attempt crime, requires specific intent. *Cox v. State*, 311 Md. 326, 330 (1988). Specific intent in the context of Butler's conviction under CR § 4-103(b)

15

requires that he attempted to remove Deputy Johnson's weapon "with the specific purpose of doing so." *See Lawrence v. State*, 475 Md. 384, 407 (2021) (explaining that to prove the requisite specific intent for the crime of transporting a handgun in a vehicle, "the State must prove that the defendant was transporting a handgun in a vehicle with the specific purpose of doing so").[8] The Court of Appeals has noted "that in finding specific intent 'the jury is permitted to draw such inferences of intent as are warranted under all the circumstances of the particular case[.]'" *Ford v. State*, 330 Md. 682, 702–03 (1993), *disapproved of on other grounds by Henry v. State*, 419 Md. 588 (2011) (quoting R. Perkins & R. Boyce, Criminal Law 854 (3d ed. 1982) (footnotes omitted)).

Butler's argument, in simpler terms, is that in order to conclude beyond a reasonable doubt that he was attempting to take Deputy Johnson's gun, a juror would have to engage in rank speculation. Butler asserts a guilty finding would be without foundation based only on (1) his statement to English: "I guess I should not have went for that weapon;" (2) Officer Kilgore's testimony confirming the same; and (3) a still photograph taken from Deputy Johnson's body camera, which Deputy Johnson testified depicted Butler's hand on Deputy Johnson's duty weapon.

In evaluating the evidence, a juror would not necessarily be engaged in "speculation" but instead would be drawing reasonable inferences from the evidence. On

---

[8] We do not find it necessary to expound any further on the meaning of "specific intent" in the context of CR § 4-103(b), since Butler's phrasing to this Court that the evidence "did not establish that Mr. Butler was *consciously* attempting to gain control of that weapon," (emphasis added) indicates that his interpretation of the requisite intent is no more stringent than ours—and moreover, is a standard which we find there was a sufficient evidence to satisfy, as we explain.

16

review, we "give[] deference to 'a trial judge's or a jury's ability to choose among differing inferences that might possibly be made from a factual situation.'" *State v. Manion*, 442 Md. 419, 431 (2015) (quoting *State v. Smith*, 374 Md. 527, 534 (2003)). Viewing the evidence in the light most favorable to the State—that Butler admitted to English that he "went for" the officer's weapon, and that his hand was indeed gripping Deputy Johnson's weapon in the photograph taken during his scuffle with officers—we cannot say that *no* rational trier of fact could have inferred beyond a reasonable doubt that Butler knowingly attempted to take Deputy Johnson's firearm from his person.

### III. Merger of Second-Degree Assault and Resisting Arrest

#### A. Parties' Contentions

Butler argues that the trial court erred in refusing to merge his conviction for second-degree assault into his conviction for resisting arrest on three grounds: (1) the special verdict sheet was insufficient under *Nicolas v. State*, 426 Md. 385 (2012); (2) the evidence was insufficient to support that Butler assaulted Johnson before the initiation of the arrest; and (3) the indictment did not include a separate second-degree assault charge other than the assault underlying the resisting arrest charge.

Butler argues that *Nicolas* stands for the proposition that a second-degree assault conviction does not merge with a resisting arrest conviction *only if* the second-degree assault preceded an announcement by the officers of their intention to arrest the defendant, or if the second-degree assault occurred after the defendant was taken into custody. He contends that the trial court's attempt to satisfy *Nicolas'* requirements by including the special interrogatories on the verdict sheet fell short. In Butler's opinion, the inclusion of

17

the special interrogatory was "premised on the faulty conclusion or reading of *Nicolas*." The trial court "provided the jury no guidance or instruction on how it was to determine whether any assault it found was separate and apart from any resisting arrest . . . ." Butler further argues that, based on this Court's holding in *Thompson v. State*, 119 Md. App. 606 (1998), the convictions must merge because the indictment failed to charge Butler with another second-degree assault other than the assault underlying the resisting arrest.

The State counters by arguing that the verdict was not ambiguous as to whether the convictions for second-degree assault and resisting arrest were based on separate acts because the jury specifically noted on the verdict sheet that it found that the second-degree assault was a separate act from resisting arrest. The State also disagrees with Butler's reading of *Nicolas*, arguing that *Nicolas* does not require a separate assault to occur before the initiation of the arrest, and holding the opposite would invite absurd results. Finally, the State disagrees with Butler's reliance on *Thompson*, arguing that the issue in *Thompson* was a multi-count indictment with a "pyramid downward" structure. The present case is distinguishable, in the State's view, because the resisting arrest charge was not the "flagship charge" and it appeared last on the indictment.

**B. Analysis**

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, prohibits multiple punishments for the same offense. *Morgan v. State*, 252 Md. App. 439, 459 (2021) (citing *State v. Frazier*, 469 Md. 627, 640 (2020)). "Merger is the common law principle that

18

derives from the protections afforded by the Double Jeopardy Clause." *Id.* at 459–60

(quoting *Frazier*, 469 Md. at 641). Further:

> [u]nder Maryland common law principles, the normal standard for determining whether one offense merges into another is the required evidence test. Because merger applies only if the two offenses are based on the same act or acts, application of the required evidence test begins by ascertaining whether the offenses at issue are based on the same act or acts. In so doing, we construe an ambiguous record in favor of the defendant. If the two offenses are unambiguously based upon different acts, our analysis ends, and merger does not apply.

*Id.* at 460 (cleaned up).

It is undisputed that second-degree assault merges into resisting arrest under the required evidence test if the convictions were based on the same acts of the defendant.[9] *Nicolas*, 426 Md. at 407 ("[W]e hold that the offense of second degree assault merges into the offense of resisting arrest under the required evidence test."). Where Butler and the State diverge is whether the separate convictions for second-degree assault and resisting arrest were based on the same conduct. In their arguments, the parties offer opposing interpretations of the Court of Appeals' holding in *Nicolas v. State*. In *Nicolas*, police responded to a call concerning a neighbor who crashed into a woman's car. *Id.* at 390–91. Officers knocked on the neighbor's door to investigate, and asked Nicolas to come outside so that they could ask him some questions. *Id.* at 391. Once Nicolas stepped outside and the first officer asked him for his ID, Nicolas walked by the officer "'kind of brushing

---

[9] Only subsection (a) of CR § 3-203 merges into resisting arrest. In *Britton v. State*, we held that second-degree assault on a law enforcement officer, codified under subsection (c), does not merge into resisting arrest under the required evidence test. 201 Md. App. 589, 604 (2011). Butler does not argue on appeal that his conviction for second-degree assault on a law enforcement officer should merge into resisting arrest.

[him] and just [pushing him]' with his arm[,]" an action that the officer interpreted as constituting an assault on a police officer. *Id.* (first two alternations in original). After Nicolas brushed and pushed the first officer, Nicolas proceeded to the porch where a second officer was located, and "hit [the officer] in the face." *Id.*

The first officer testified that after he was brushed and pushed by the Nicolas, he decided he would place Nicolas under arrest for assaulting a police officer and "repeatedly told" Nicolas that he was under arrest. *Id.* at 391–92. When Nicolas attempted to reenter his home, the first officer grabbed him to try and keep him outside. *Id.* at 392. A struggle ensued inside the home, where Nicolas and the officer continually grabbed and hit each other. *Id.* Eventually, the officers were able to get Nicolas outside and placed handcuffs on him, despite Nicolas' continued efforts to resist. *Id.*

The crux of Nicolas' argument was that the record was ambiguous "as to whether the jury convicted him of assault based on conduct that preceded or followed the initiation of the officers' attempt to arrest him" and that the ambiguity must be resolved in his favor. *Id.* at 411. The Court of Appeals agreed, holding that, in resolving the factual ambiguities at trial in Nicolas' favor, his convictions for assault and resisting arrest were based on the same acts and should have been merged at sentencing. *Id.* at 408. Key to the Court's decision was the ambiguity in *when* the officers initiated the arrest. Reasoning that a reasonable jury could have found that the arrest began before or after the assaults, the Court ruled in Nicolas' favor and merged the convictions. *Id.* at 412–14.

Butler asks us to read *Nicolas* as establishing a bright line rule requiring merger whenever a second-degree assault occurs after the initiation of the arrest. The State cautions

that adopting this interpretation would lead to a scenario where a trial court sentencing a defendant who assaulted twenty police officers in the course of resisting a single arrest would be required to merge the twenty assaults into the one count of resisting arrest, resulting in a maximum of three years' imprisonment. We disagree with Butler's reading of *Nicolas* and decline to hold that *Nicolas* requires merger whenever an assault occurs after the initiation of an arrest.

In *Britton v. State*, we held that the crime of second-degree assault on a law enforcement officer, codified under CR § 3-203(c), does not merge with resisting arrest under the required evidence test. 201 Md. App. 589, 604 (2011). And in *Purnell v. State*, 375 Md. 678, 698 (2003), the Court of Appeals recognized that the possibility existed "that a defendant may be guilty of multiple assaults during the course of resisting arrest." *Britton*, 201 Md. App. at 603 (discussing the import of the Court of Appeals' reasoning in *Purnell*). When multiple officers are injured in the course of an arrest, the Court of Appeals advised that the proper response is not multiple convictions for resisting arrest, but "the prosecution of the resister for assault against each officer." *Purnell*, 375 Md. at 698–99. We expanded on this point in *Britton*:

> [m]oreover, merging an assault conviction into a resisting arrest conviction that is based on distinct acts, as appellant asks us to do, would have troubling consequences. First, it would ignore the fact, noted by the Court of Appeals in *Purnell*, that the two crimes have different focuses. Second, it would ignore the difference in severity of the two crimes, creating the absurd result of compelling the circuit court to merge a serious felony that has a maximum sentence of ten years, into a misdemeanor that has a maximum sentence of three years and an entirely different focus. Third, it would give the resister a free pass, or, as one other State court has put it, a "volume discount" on crime. *See Commonwealth v. Anderson*, 538 Pa. 574, [579] (1994) ("Our concern . . . is to avoid giving criminals a 'volume discount' on crime."),

21

*superseded by statute on other grounds as stated in Commonwealth v. Coppedge*, 984 A.2d 562, 564 (Pa. Super. Ct. 2009). Knowing that he would receive one resisting arrest conviction, and nothing more, regardless of the number of officers he assaulted, the suspect, once he had begun to resist, would be free to assault each and every officer with no additional consequences.

201 Md. App. at 604. Drawing on this reasoning from *Britton*, adopting a bright line rule from *Nicolas* would invite "absurd results" like those discussed above. *See also Purnell*, 375 Md. at 703–04 (adopting the reasoning of the Supreme Court of Florida highlighting the absurdity of a "motorist who continues driving despite an order to pull-over, resulting in a chase involving 100 squad cars, each occupied by two officers. Is it reasonable to believe that the legislature contemplated the single act[] of resistance to constitute 200 counts of resisting an officer . . . ?" *Wallace v. State*, 724 So. 2d 1176, 1181 (Fla. 1998)).

We think that the rationale applied in *Britton*—even though *Britton* addressed merger between second-degree assault against a law enforcement officer (CR § 3-203(c)) and resisting arrest—is similarly applicable to simple second-degree assault (CR § 3-203(a)). This makes sense. Naturally, the only scenario where second-degree assault and resisting arrest presents a question of merger will be if the assaultive conduct was against a law enforcement agent attempting to effectuate an arrest. Thus, we adopt the reasoning in *Britton* and decline to adopt Butler's reading of *Nicolas.*

Now that we have determined that *Nicolas* does not necessarily require merger when an assault follows the initiation of an arrest, we next turn to the record to determine whether any ambiguity existed in the jury's verdict as to whether the resisting arrest and second-degree assault charge were based on the same act or acts, or whether they were discrete

22

acts. In making this determination, courts have looked at the prosecutor's closing argument, in addition to "the charging document, jury instructions, verdict sheet, and evidence introduced at trial to determine whether ambiguity existed." *Johnson v. State*, 228 Md. App. 27, 47, 49 (2016) (citing *Morris v. State*, 192 Md. App. 1, 39 (2010)). We find no such ambiguity here. The evidence presented at trial, in conjunction with the prosecutor's closing argument and the specialized verdict sheet indicate that the jury's convictions of resisting arrest and second-degree assault were based on discrete acts.

We turn now to the second-degree assault against Deputy Johnson.[10] At trial, on direct examination, Deputy Johnson testified that after Butler got out of his car, Butler turned around and balled up his fists, which Deputy Johnson interpreted as confrontational. Attempting to arrest Butler, Deputy Johnson charged at Butler and the two got into a physical altercation. Butler was able to put Deputy Johnson in a headlock and strike him in the face with a closed fist. It was this conduct that the prosecutor, in her closing statement, described to the jury as one of the second-degree assault charges. In closing, the prosecutor stated:

> [THE STATE]: When the Defendant got out of the car you heard from Deputy Johnson . . . he's in a fighting stance. *He's not resisting*, he's not running away, he's ready to fight. Ladies and gentlemen, this is what starts an assault.
>
> . . .

---

[10] Butler asks us to merge both convictions for simple second-degree assault (CR § 3-203(a)), including the one against Officer Washington. However, the trial court merged the conviction for simple second-degree assault against Officer Washington with Butler's conviction of assault on a law enforcement officer (CR § 3-203(c)), which we know does not merge into resisting arrest. *Britton*, 201 Md. App. at 604. Therefore, the only remaining conviction available to merge is the simple second-degree assault against Deputy Johnson.

[THE STATE]: Deputy Johnson tells you he was heading toward the Defendant but the Defendant came at him and got him on the ground. Got him in a headlock. *That's an assault*.

(Emphasis added). The prosecutor took care to describe to the jury that, in the State's theory of the case, this was the conduct that constituted the second-degree assault against Deputy Johnson and was a separate act from resisting arrest.

Then there was testimony describing Butler's acts of resisting arrest. Deputy Johnson testified that after Butler had assaulted him by holding him in a headlock and striking him in the face, Butler went after Officer Washington, tackling him to the ground—conduct that was the basis for the second-degree assault convictions, both CR § 3-203(a) and (c), against Officer Washington. Deputy Johnson, along with other officers, then attempted to get Butler off Officer Washington, and Deputy Johnson testified that he had Butler in a hold in an attempt to subdue him. Deputy Johnson then testified that even though he had Butler in a hold, he called for the use of a taser because, "the subject was still *actively resisting* and fleeing and was actually throwing small jabs into my left side of my vest." Deputy Johnson further testified that several officers were "trying to get the subject to place his hands behind his back and *stop actively resisting*, to be placed under arrest[,]" and that even while having the K-9 try to subdue Butler, Butler "trie[d] to swipe my feet out from underneath me and [was] *still actively resisting at [that] time*." (Emphasis added).

Again, this was the conduct the prosecutor pointed to in her closing statement as constituting the resisting arrest charge:

24

[THE STATE]: And then, after that, once Deputy Johnson was able to pull the Defendant off of Officer Washington, he didn't stop. That's when he began *to resist any efforts that were placed on him*. There was a taser; didn't work. There were soft hands; didn't work. There were what we would refer to as hard hands, and those, ladies and gentlemen, you'll see them. If you watched the video again, those were punches . . . because they were doing anything they could to get this guy subdued.

. . .

[THE STATE]: And because he placed that dog on the Defendant, who was running out of steam, gave up the one arm, they were able to put that in handcuffs. . . . *didn't stop resisting though*, still had the other arm under him.

(Emphasis added). Here, like her closing statement regarding the second-degree assault against Deputy Johnson, the prosecutor took care to identify for the jury the precise conduct pertaining to the resisting arrest charge.

In addition to the evidence presented and the closing arguments, the verdict sheet—and the trial court's instruction to the jury regarding the verdict sheet—provided further clarity regarding whether the jury's verdict was based on separate conduct. The verdict sheet included a special interrogatory asking the jurors, *if* they found Butler guilty of either charge of simple second-degree assault, whether "the assault was a separate act or acts from the act or acts of resisting arrest?" The verdict sheet appeared as such:

**SECOND-DEGREE ASSAULT (Donald Johnson, Jr.)**

Not Guilty       _____

Guilty       ✓

> If your verdict is guilty to Second-Degree Assault upon DFC Donald Johnson, Jr., do you find that the assault was a separate act or acts from the act or acts of resisting arrest?

25

NO          _____

YES          ✓

Upon finding that Butler was guilty of second-degree assault against Deputy Johnson, the jury then found that the conduct was separate from the act of resisting arrest, further demonstrating the unambiguity of the verdict.

Finally, we address Butler's misplaced reliance on *Thompson v. State*. In *Thompson*, a fact-specific case,[11] we merged an assault conviction with an armed robbery conviction because the charging document did not include a separate assault charge of which the defendant was convicted. 119 Md. App. at 609. According to Butler, *Thompson*'s primary teaching is that the question of merger rests "not in the state of the evidence but in the state of the pleadings[,]" and that "[t]he pertinent question is not whether more than one assault was conceivably proved[,]" but "whether more than one assault was actually charged[.]" *Id.* And in Butler's view, this means that because the indictment in this case did not charge him "with a second set of second-degree assault charges apart from the assaults *underlying the resisting arrest*[,]" the two convictions must merge. (Emphasis added).

_____

[11] The facts in *Thompson* involved the defendant robbing three individuals at gunpoint, stealing seven dollars from one of them before leaving, only to return between three and thirty minutes later to rob the same three individuals again, also at gunpoint, this time walking away with a quantity of narcotics. 119 Md. App. at 610. The merger issue arose from the confusion between the earlier and later robbery incident, a factually distinct scenario from the present case where the incident was one course of conduct, reflected as such in the indictment.

26

The portion that Butler highlights reveals the flaw in his reasoning. Butler argues that his assault against Deputy Johnson was the same conduct underlying the resisting arrest. But based on the evidence, the prosecutor's closing arguments, and the verdict sheet, the jury found that Butler's assault of Deputy Johnson was separate and distinct from resisting an arrest that several officers were trying to effectuate. The jury could find Butler committed numerous acts in resisting arrest, such as physically fighting several police officers, not surrendering after an officer twice tried to tase him, or not surrendering after K-9 Cairo twice bit him, among other acts. There is no question that the prosecution specifically sought to convict Butler for assaulting Deputy Johnson by putting him in a headlock and punching him in the jaw. In other words, there was sufficient evidence for the jury to draw a distinction between Butler resisting arrest and Butler assaulting Deputy Johnson. Therefore, we conclude that *Thompson* is inapplicable to the facts here and offers Butler no support.

To conclude, we first hold that *Nicolas* does not require merger merely because an assault occurs after an arrest is initiated. Second, based on the evidence presented, the prosecutor's closing statement, and the specialized verdict sheet, we hold that there is no ambiguity that the jury's verdict was based on separate and distinct acts. Further, Butler's reliance on *Thompson* is misplaced. Thus, we hold the trial court did not err in not merging Butler's convictions for second-degree assault against Deputy Johnson and resisting arrest.

Having found none of Butler's arguments availing, we affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY**

27

**AFFIRMED. APPELLANT TO PAY THE COSTS.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1037s21cn.pdf